## BRIGGS–DARBY CONST. CO. v. COMMISSIONER OF INTERNAL REVENUE.

### BRIGGS–KILLIAN CO. v. SAME.

### BRIGGS–SPENCE CO. v. SAME.

### W. M. THORNTON, Inc., v. SAME.

### Nos. 9673–9676.

Circuit Court of Appeals, Fifth Circuit.

April 15, 1941.

Camden R. McAtee, of Washington, D. C., for petitioner.

Helen R. Carloss and Sewall Key, Sp. Assts. to Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., and J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and Irving M. Tullar, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

Four petitions for review of decisions by the Board of Tax Appeals have been consolidated for hearing. The cases are much alike though not identical. R. W. Briggs and Company, a corporation, was a highway construction contractor, and Darby, Killian, Spence and Thornton were superintendents employed on different jobs, but holding no stock in the employer corporation. A plan was conceived of forming four corporations, one for each superintendent and bearing his name, which would take over the equipment which each superintendent was using and in which he would take 45% of the stock (30% in one case) on an arrangement whereby he might pay for it out of his share of his corporation's profits. Four separate written contracts were during the fall of 1931 made to that effect, fixing the price to be put on the several lots of equipment, the drawing salary of each superintendent, the amount of stock he was to take, and the plan of payment. Darby on his contract was to give his notes to Briggs and Company, secured by a transfer and deposit of his stock certificates. Killian in his contract agreed to purchase 45% of the stock, but notes were not mentioned. Dividends on his stock were to go against the purchase. Spence's contract was similar. Thornton's was in form an absolute agreement to purchase 750 shares in the new corporation at $5 per share to be paid for in two years, and if not paid for contract to be cancellable at option of Briggs and Company. The corporations were all organized, Briggs and Company transferred to each the agreed equipment at the agreed prices, and received therefor all the capital stocks. The several superintendents' shares were handled according to their several agreements, and each of them during 1932 and 1933 had paid for and received his stock. Corporate income taxes for 1933 and 1934 are here in question. The prices paid for the several lots of equipment by the new corporations were in excess of the depreciated cost in the hands of Briggs and Company. The taxpayers figured depreciation on the price paid by each as a new cost basis. The Commissioner and the Board held them to the depreciated cost basis of Briggs and Company on the ground that there had not really been sales, but only corporate reorganizations. Sections 113(a) (7), 113 (a) (8), 112(b) (5), Revenue Acts, 1932 and 1934, 26 U.S.C.A. Int.Rev.Acts, pages 511, 516, 692, 698. See also Section 114(a), 26 U.S.C.A. Int.Rev.Acts, pages 519, 701.

Briggs and Company transferred in each case less than five percent of its assets, and continued in business. There was not a transfer of all its assets, or any sort of merger. The four corporations were sepa-

rately contracted about, separately organized, and separately dealt with. Neither superintendent had any interest save in the corporation bearing his name. Each corporation the Board held to be a reorganization either under Section 113(a) (7) or Section 113(a) (8), which would preserve unchanged the basis for depreciation that Briggs and Company had; citing American Compress Co. v. Bender, 5 Cir., 70 F. 2d 655. It is conceded in argument that under either paragraph of Section 113 the question gets back to Section 112 defining reorganizations and the "control of the corporation immediately after the exchange" of property for its stock. Section 112(j) provides: "As used in this section the term 'control' means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation." 26 U.S.C.A. Int.Rev.Acts, page 514. Had Briggs and Company "ownership" of eighty percentum or more of the stocks of the several taxpayer corporations immediately after transferring to them the several lots of equipment?

■ The Commissioner argues and the Board held that since on the day each corporation was organized its entire stock was issued to Briggs and Company in exchange for the property transferred, and none stood in the name of a superintendent until he paid for it, Briggs and Company owned more than eighty percent, indeed one hundred percent, immediately after each transfer. The Board thought Briggs and Company owned the stock contracted to the several superintendents until they paid for it, and that the only arguable question was whether Darby's stock was paid for by his giving notes for it. We think "owned" means more than standing in the name of. It includes equitable ownership, and the right to substantial enjoyment. As we see it, these corporations would never have been organized at all but for the plan to tie the several superintendents to and interest them financially in the work they each had in hand. Each contract bound a superintendent to buy a stated amount of stock, exceeding twenty percent, and recognized that the share in the profits of the company attributable to his stock should belong to him, and should be applied to the payment of his debt for that stock. This made the superintendent the substantial owner of his stock from the instant the corpora-

tion was launched. His corporation's interests were 45% his own. He had represented it in fixing the price it was to pay Briggs and Company for the equipment. There was a real sale of the equipment for that price, rather than a reorganizational shift from one corporation to another with no substantial change in ownership. We think this is not a case in which Briggs and Company immediately after the transfer "owned" eighty percent of the stocks, but one in which the superintendents had such rights in their portions of the stocks as prevented such ownership by Briggs and Company as the statute contemplates. Compare Tulsa Tribune Co. v. Commissioner, 10 Cir., 58 F.2d 937; Bassick v. Commissioner, 2 Cir., 85 F.2d 8; Hazeltine Corporation v. Commissioner, 3 Cir., 89 F.2d 513. Since there was a sale and not a statutory reorganization, Briggs and Company realized a gain in disposing of the equipment and the purchasing corporations each got a new basis for depletion.

■ A contention is also made that excess profits taxes assessed under Sections 215, 216 of the National Recovery Act, 48 Stat. 207, 208, and Sections 701, 702 of the Revenue Act of 1934, 26 U.S.C.A. Int. Rev.Acts, pages 787, 789, are unlawful because the statutes are arbitrary and violate the Fifth Amendment of the Constitution. As pointed out in Haggar Co. v. Helvering, 308 U.S. 389, 60 S.Ct. 337, 84 L.Ed. 340, the taxpayer corporation is allowed to declare initially the value of its capital stock without check by the Government, for the purposes of capital stock tax, but is liable to have its excess profits tax increased as a result of fixing a low value, so that the declared value is a matter of indifference to the Government. We think this does not result in any want of due process in the excess profits tax because of vagueness or uncertainty in the declaration of value which helps to determine the amount. The taxation is not rested upon "fancy stimulated by duress." The initial declaration is not intended to be fanciful. The statute speaks of "the value * * * declared by the corporation in its first return", and the return is under oath. It is presumed to be a true expression of value, though no process of correction is provided. It is made permanent and unamendable, and that is supposed to secure dependability, for it may cut both ways. It does not invalidate a tax law to leave value or other

relevant fact to the mere statement of the taxpayer, however unwise it might seem in most circumstances. There is no room for complaint by the very corporations who have made the unfettered declarations on which their taxation was based.

The judgment of the Board is reversed on the matter of the basis for estimating depreciation, with direction to take further proceedings consistent with this opinion.