**HAZELTINE CORPORATION v. COMMIS-
SIONER OF INTERNAL REVENUE.**

**COMMISSIONER OF INTERNAL REVE-
NUE v. HAZELTINE CORPORATION.**

Nos. 6136, 6170.

Circuit Court of Appeals, Third Circuit.

April 8, 1937.

Douglas & Armitage, of New York City (Paul Armitage and Edward Holloway, both of. New York City, E. H. McDermott and E. C. Alvord, of Washington, D. C., of counsel), for Hazeltine Corporation.

Robert H. Jackson, Asst. Atty. Gen., J. Louis Monarch, of Washington, D. C., and Helen R. Carloss, Sp. Assts. to the Atty. Gen., for Commissioner of Internal Revenue.

Before BUFFINGTON and THOMPSON, Circuit Judges, and MARIS, District Judge.

MARIS, District Judge.

These are petitions by Hazeltine Corporation, petitioner below, and the Commissioner of Internal Revenue, respondent below, to review a decision of the Board of Tax Appeals determining a deficiency in the petitioner's income tax for the year 1930. For a proper understanding of the questions involved a full statement of the facts is required. They are that petitioner was incorporated January 29, 1924, for the primary purpose of taking over from Hazeltine Research Corporation certain patents, applications for patents and inventions relating to the radio art developed by Louis A. Hazeltine. Hazeltine was professor of electrical engineering at Stevens Institute of Technology and since 1915 had made a specialty of radio. Prior to 1923 the radio receivers on the market were not satisfactory because they were subject to squeals, howls, and whistles. Hazeltine devoted his time to perfecting a radio receiver which would eliminate these noises.

On August 7, 1919, he made application for his first patent, upon which subsequently was granted patent No. 1,450,080 entitled "Method and Electric Circuit Arrangement for Neutralizing Capacity Coupling." This disclosed his basic invention, which was further covered and the specific applications thereof protected by various other patents thereafter granted upon his subsequent applications. By neutralizing the tendency to feed back between the tubes through the means of condensers and other instrumentalities Hazeltine's invention prevented the undesirable oscillations and resulting noises. By simplicity of operation, ready dialing and stability, radio receivers thereby became usable by the public. This was a notable advance. Hazeltine named his arrangement the "Neutrodyne," and receivers embodying it became known as Neutrodyne receivers. It was put into successful operation in December, 1922.

On February 17, 1923, Hazeltine entered into a written contract with the Independent Radio Manufacturers, Inc. (herein referred to as I. R. M.). The stockholders of this corporation were a number of radio manufacturers interested in obtaining the right under the Hazeltine inventions to manufacture receivers including his "Neutrodyne" arrangement. The I. R. M. contract in substance provided, among other things, that the stock of I. R. M. should be owned only by persons engaged in the business of manufacturing and selling radios, that the licenses granted to I. R. M. should extend to its stockholding companies only when they were licensed by I. R. M. under its sublicensing power, that Hazeltine granted to I. R. M. an exclusive license to manufacture and sell radio receiving apparatus embodying the inventions set forth in his applications to the end of the terms for which the patents were granted and for the period of any renewals, and that the license granted should extend to all future applications and patents constituting improvements. I. R. M. agreed to pay certain royalties to Hazeltine and to collect certain royalties from its licensees. The agreement, while not transferable by I. R. M., was assignable by Hazeltine. On February 27, 1923, Hazeltine filed in the Patent Office three applications for registration of the trade-marks "Neutrodyne," "Neutroformer," and "Neutrodon," which were registered on August 21, 1923. On August 28, 1923, Hazeltine assigned to Hazeltine Research Corporation, which he had previ-

ously organized and of which he was the sole stockholder, patent No. 1,450,080, the various other patent applications, all reissues and extensions of those patents, certain "other improvements and inventions relating to 'Uni-Control of Radio Receivers' and improvements relating to the 'Disposition of Coils at an Incline to Prevent Magnetic Coupling There Between,'" the I. R. M. contract and his entire business and good will, including the trade-marks above mentioned.

During December, 1923, or January, 1924, one of the sublicensees of I. R. M. attempted to cut down on the rate of royalties, which necessitated legal proceedings. Hazeltine then requested Willis H. Taylor, Jr., his friend and patent counsel, to see what could be done toward capitalizing the inventions so that Hazeltine might get out of the commercial field and devote his time to research and professional work. Robert E. McConnell, an engineer and member of the investment firm of Foster, McConnell & Co., was a mutual friend of Taylor and Hazeltine. Negotiations were had with McConnell which matured into a contract on February 2, 1924. At this time also two radio inventors, the Dreyer brothers, were preparing to file an application for a patent on the "Means for Neutralizing Capacity Coupling." All of their rights in that invention had been acquired by Taylor. The application was filed on February 20, 1924, and resulted in a patent being granted June 5, 1928.

The contract dated February 2, 1924, was made between Hazeltine, Hazeltine Research Corporation, Taylor, and the firm of Foster, McConnell & Co. It provided that Hazeltine Corporation would be organized under Delaware law with 200,000 shares of no par value stock and three to eleven directors. Hazeltine, Taylor, and one Russ would be directors, but Foster, McConnell & Co. would nominate the balance of the board. On notice from that firm Hazeltine Research Corporation agreed to transfer to the new corporation the patents, applications, and trade-names set forth in an attached schedule relating to the Neutrodyne inventions (and also certain improvements in "Uni-Control" or Unit Control of broadcast receivers) that had been invented by Hazeltine, all agreements with I. R. M. and any business and good will of Hazeltine Research Corporation associated with the aforesaid assets. Hazeltine and Hazeltine Research Corporation agreed to

assign rights to obtain foreign patents and to lend any assistance necessary to obtain the same.

Upon acquisition of this property by the new corporation 155,250 shares of its stock would be issued to Hazeltine Research Corporation and 14,750 shares to Taylor in consideration of the transfer by him of the Dreyer invention covering a small instrument (condenser) valuable in accomplishing the Hazeltine neutralization. Foster, McConnell & Co. were to subscribe for 5,000 shares at $10 per share and the balance of 25,000 shares would remain unissued until further order of the directors. It was further provided that Hazeltine Research Corporation should immediately transfer 135,000 shares of the stock to Foster, McConnell & Co. for $650,000 cash payable on delivery of the stock. Hazeltine and Hazeltine Research Corporation also gave that firm an option for one year to purchase 10,000 shares at $15 per share and Taylor gave the firm a similar option on 7,500 shares. Hazeltine contracted to assign any new inventions covering improvements on the inventions transferred or any alternate or substitute devices or parallel developments without further consideration. The new corporation would ratify an agreement of January 29, 1924, between Hazeltine and Harold M. Wheeler to employ Wheeler for two years. The contract was to be performed within five days after written notice by the firm to the other parties, but if notice was not given on or before March 1, 1924, the contract was void.

Hazeltine Corporation, the petitioner below, was the new corporation referred to in the contract and it had been organized on January 29, 1924. The first meeting of its board of directors was held February 15, 1924. At this meeting the contract was ratified. Hazeltine and Taylor then retired and the remaining directors determined pursuant to the Delaware statute that the value of the assets to be received for the 170,000 shares of stock was $3,500,000. Prior to this meeting Foster, McConnell & Co. had proceeded with the preparations for marketing the 140,000 shares of stock it was to receive. A syndicate had been organized and on February 11, 1924, public trading in petitioner's stock had begun on the New York Curb Exchange on a "when, as and if issued" basis. The firm had also organized H. N. Corporation, a trading corporation for members of the firm, and had assigned to it the firm's interest in the contract of February 2, 1924. Verbal notice of intent to proceed under the contract had been given by the firm to the other parties on or prior to February 11th and on February 15, 1924, H. N. Corporation, by written notice called for performance of the contract by February 20, 1924.

On February 19, 1924, Hazeltine Research Corporation executed a general assignment of the Neutrodyne patent, applications and trade-marks to petitioner, followed on February 20th by separate assignments of the specific patent applications, inventions and the I. R. M. contract. On the same day Taylor executed an assignment of the Dreyer invention. On February 19, 1924, Hazeltine Research Corporation executed an assignment of 135,000 shares of stock of petitioner to Foster, McConnell & Co. Stock certificates dated February 18, 1924, were prepared as follows:

| | | |
|---|---|---|
| T-1 | Hazeltine Research Corporation | 135,000 shares |
| T-2 | Foster, McConnell & Company | 5,000 shares |
| T-3 | Hazeltine Research Corporation | 20,250 shares |
| T-4 | Willis H. Taylor | 14,750 shares. |

All these certificates were delivered on February 19th to the parties in whose names they were issued except T-1. This certificate never came into possession of any of the officers or agents of Hazeltine Research Corporation and on February 19th certificates T-1 and T-2, the latter issued for cash subscribed by the firm to petitioner, as per contract, were canceled and new certificates T-5 to T-1192, inclusive, for a total of 140,000 shares, were issued for distribution on February 20th to participants in the syndicate and purchasers on the Curb. On February 19th Hazeltine Research Corporation received the check of H. N. Corporation for $650,000. These transactions were simultaneous and completed the performance of the contract of February 2, 1924.

Hazeltine Research Corporation had also conducted some researches in other fields. For a time it held the "power value" patents of Hazeltine concerned with the conversion of large blocks of electrical energy. The transfer to the petitioner did not include these other patents and inventions or any other assets save the Neutrodyne patents. It continued in existence un-

til 1926 or 1927, when it was dissolved and its assets distributed to its stockholders.

On February 11, 1924, Foster, McConnell & Co. had invited Colgate, Hoyt & Co. to participate with them in a syndicate to sell 135,000 shares of the petitioner's stock at $10 a share less a selling commission of $2 a share and 5,000 shares at $10 without commission. This offer was accepted and 40,000 shares were allotted to Colgate, Hoyt & Co. for delivery on or about February 20th. About the same time the two firms issued a prospectus offering 140,000 shares for sale at $10 a share. This stock was largely oversubscribed prior to its issuance. Trading in the stock on the New York Curb Exchange on a "when, as and if issued" basis continued from February 11th. Between February 13th and 25th, inclusive, 36,600 shares were sold on that exchange. On February 19th, the date of the transfer, 4,500 shares were sold on the Curb and the prices ranged from 13¾ to 15 (the figure 14 appearing in the printed record being a typographical error), the average price being 14⅜. There was no suggestion that this was not a fair and open market or that it was distorted by abnormal conditions or factors.

The evidence indicated that the major value of the depreciable patents acquired by the petitioner for the issuance of its 170,000 shares of stock lay in the Hazeltine neutralizing invention. The value of the Uni-Control invention was relatively small, not over 15 per cent. of the entire value. It was indicated that the expected, commercial life of the "Neutrodyne" group of patents, inventions, and applications was between five and ten years.

Shortly after February 19, 1924, petitioner created a laboratory and an engineering staff. Its employees made inventions which were assigned to it by prior agreements, 128 applications having been filed and 69 patents having been granted to it since 1924.

The I. R. M. contract was canceled on June 6, 1927, and a new agreement entered into merely granting to the members of I. R. M. nonexclusive licenses under all the Hazeltine patents and reducing the royalty rate. In 1925 petitioner acquired 80 per cent. of the capital stock of the Latour Corporation for a consideration of $275,000 and a five-year contract for the services of Latour. There were 57 Latour patents, some of which did not relate to radio receivers. After the cancellation of the original I. R. M. contract in 1927 the petitioner's licensees also acquired the right to use the Latour inventions. During 1929 petitioner acquired the remaining 20 per cent. of stock of the Latour Corporation.

The total royalties received by petitioner from all sources as shown by its books and reported in its income tax returns are as follows:

| | | | |
|---|---|---|---|
| 1924 | $550,887.02 | 1928 | $ 608,652.87 |
| 1925 | 594,767.05 | 1929 | 919,835.37 |
| 1926 | 432,616.04 | 1930 | 1,172,409.32 |
| 1927 | 350,086.22 | 1931 | 584,973.90 |
| | | 1932 | 382,797.18 |

In 1933 an accounting was conducted under court orders and it was estimated that petitioner might possibly recover approximately $2,600,000 as damages from certain infringement suits which had been instituted.

In 1929 and 1930 the patents and patent applications acquired by petitioner from Hazeltine Research Corporation lost a large part of their value by reason of the more general use of the screen grid tube and superheterodyne circuit, both of which obviated neutralization, and after 1930 manufacturers practically ceased making Neutrodyne receivers.

In its income tax return for 1930 petitioner deducted $246,901.71 for amortization of patents. The Commissioner disallowed $242,071.76 with respect to patents acquired from Hazeltine Research Corporation on the ground that no cost basis had been established, and allowed $4,829.95 on patents acquired for cash. Petitioner also deducted $41,363.92 for patent applications and $36,681.26 for patent interferences. The Commissioner disallowed these deductions as items which should be capitalized and also an item concerning bad debts which is not here involved. He thereupon determined a deficiency in income tax for the year of $45,014.04.

On appeal the Board of Tax Appeals held that there was not an exchange of assets of Hazeltine Research Corporation for stock of the petitioner which resulted in the former being in control of the latter within the meaning of section 113 (a) (7) and section 112 (b) (5) of the Revenue Act of 1928 (26 U.S.C.A. §§ 113 note, 112 (b) (5) and note) so that the petitioner was not required to use the transferor's base for depreciation purposes.

518

It held further that the petitioner's base for the group of "Neutrodyne" patents was $1,275,000 or 75 per cent. of the fair market value of the stock issued for all the assets, which it found to be $1,700,000—$10 per share. The remaining 25 per cent. of value it held represented nondepreciable assets. The Board directed that the base so determined be depreciated over a seventeen year life. It further sustained the Commissioner in disallowing deductions for expenses in securing patents and defending interferences and reduced the petitioner's deficiency in tax to $36,014.04. Both the petitioner and the Commissioner thereupon appealed to this court.

As is obvious from the foregoing recital, there are a number of questions raised by the parties to this record. The first is as to whether the depreciation base for the Neutrodyne patents was their cost to the petitioner or their cost base in the hands of petitioner's transferor, Hazeltine Research Corporation. The determination of this question in turn depends, under section 113 (a) (7) and section 112 (b) (5) of the Revenue Act of 1928, upon whether immediately after the transfer on February 19, 1924, Hazeltine Research Corporation retained 80 per cent. control of the stock of the petitioner. As to this the petitioner contends that after the contract of February 2, 1924, was performed the Hazeltine Research Corporation owned only about 12 per cent. of the stock of petitioner and that it was never contemplated that that corporation should have any substantial interest in petitioner. An examination of the contract of February 2d discloses quite clearly that there was no intention by Hazeltine Research Corporation to retain more than 20,250 shares of petitioner's stock for any length of time; the remaining 135,000 shares to which it was entitled were to be simultaneously delivered to Foster, McConnell & Co. for $650,000 in cash. As we have seen, the certificate for 135,000 shares was never in fact delivered to Hazeltine Research Corporation, but pursuant to its contemporaneous assignment that certificate, or the new certificates into which it was broken up, were actually delivered to Foster, McConnell & Co. by petitioner. We are satisfied that the transaction must be viewed as a whole. West Texas Refining & D. Co. v. Commissioner (C.C.A.) 68 F.(2d) 77; Halliburton v. Commissioner (C.C.A.) 78 F.(2d) 265; Bassick v. Commissioner (C.C.A.) 85 F.(2d) 8. So viewed, Hazeltine Research Corporation did not retain control of petitioner after it was carried through. It, therefore, follows that the depreciation base of the assets acquired by petitioner from Hazeltine Research Corporation on February 19, 1924, was their cost to petitioner on that date.

This brings us to the consideration of the amount of that cost. On this question the parties are quite far apart, the petitioner contending that the cost was as much as $3,500,000, while the Commissioner argues that it was only $852,500. The Board held that the cost of the property which was acquired for stock of the petitioner was the fair market value of the stock given in exchange for it, and we agree that this was the correct rule to apply. Rice v. Commissioner (C.C.A.) 47 F.(2d) 99; Pierce Oil Corp. v. Commissioner, 32 B. T. A. 403; MacCallum Gauge Co. v. Commissioner, 32 B. T. A. 544. It, therefore, becomes necessary to determine the fair market value of the petitioner's stock as of February 19, 1924, the date of the acquisition of the assets. The Board determined this value to be $10 per share, saying: "In this proceeding we note that Foster, McConnell & Co. paid $10 per share for 5,000 shares of stock purchased from the petitioner. It further appears that Foster, McConnell & Co. was able immediately to sell approximately all of the 135,000 shares of stock which it had acquired from the Hazeltine Research Corporation at approximately $10 per share. We think that this is the fair market value of the stock as of February 19, 1924, the date when the Hazeltine Research Corporation transferred its assets relating to the neutrodyne inventions to the petitioner. We therefore have found the cost of the total assets acquired by the petitioner from Hazeltine Research Corporation and from Taylor to have been $1,700,000."

It will be seen that the Board largely based its finding upon the price agreed upon between Foster, McConnell & Co. and the petitioner and the price for which that firm sold the shares to its subscribers. Foster testified that the entire block of stock was largely oversubscribed prior to its issuance on February 19th. It is thus seen that these sales do not reflect the market price on that date. On the contrary, the fact that the stock was largely over-

subscribed at the initial price of $10 per share when considered with the fact that the stock opened on the New York Curb on February 13th at 13 and continued to rise thereafter, leads to the conclusion that the initial subscription price of 10 was less than the fair market value of the stock. The Board seems to have ignored the evidence of fair market value furnished by the sales upon the Curb Exchange and in this we think it fell into error. The primary evidence of the fair market value of corporate stock is what willing purchasers pay to willing sellers on the open market, even though the assets of the corporation do not reflect such values. Appeal of Edwin M. Brown, 1 B. T. A. 502; Commissioner v. Robertson (C.C.A.) 75 F. (2d) 540, certiorari denied 295 U.S. 763, 55 S.Ct. 922, 79 L.Ed. 1705. It is true that if market sales are made under peculiar and unusual circumstances, such as sales of small lots, forced sales, and sales in a restricted market, they may not furnish evidence of fair market value. Heiner v. Crosby (C.C.A.) 24 F.(2d) 191. In the present case, however, the evidence indicated a large volume of trading in these shares in a market which was fair and open and not distorted by any abnormal conditions or factors. On the very day the transaction was carried through, 4,-500 shares, over 2½ per cent. of the total involved, were sold on the Curb Exchange, and the undisputed evidence indicates that the average price on that day was 14⅜ per share. During the entire month of February 36,600 shares, over 21½ per cent. of the total, were similarly sold on the Curb at average prices, varying but little from the prices realized on February 19th. In the light of these facts we are of opinion that the fair market value of the shares on February 19th was conclusively established by the evidence of the sales which took place on the Curb Exchange on that day. Hyatt Roller Bearing Co. v. United States (Ct.Cl.) 43 F.(2d) 1008; Metropolitan Life Insurance Co. v. United States, 65 Ct.Cl. 149; Henritze v. Commissioner, 28 B.T.A. 1173. In view of this definite fixing by the public of the fair market value of the stock on the very day in question, we think the evidence of prior arrangements between the promoters and the companies involved, obviously not entered into at arm's length, cannot furnish the basis for a finding of fair market value. It follows that the finding by the Board

of a value of $10 per share has no substantial evidence to support it. We accordingly hold that the fair market value on February 19, 1924, of the stock issued by petitioner in exchange for the assets here involved was $14.375 per share. The cost of the assets received by petitioner on that date in exchange for its stock was, therefore, $2,443,750.

The Commissioner strongly urges that if the transaction is to be viewed as a whole, and we have so held, it necessarily follows that the cost of the property acquired by the petitioner was only $650,000 in cash plus the fair market value of 35,000 shares of its stock. This for the reason that the sale of 135,000 shares of petitioner's stock by the vendor, Hazeltine Research Corporation, to Foster, McConnell & Co. for $650,000 was provided for by the contract of February 2, 1924, as an integral part of the transaction to be carried through simultaneously with the transfer. This may be conceded, but it does not follow that the petitioner was bound to accept this figure as the cost of the assets it purchased from Hazeltine Research Corporation. The sum of $650,000 in cash was not paid by the petitioner to Hazeltine Research Corporation, but was received by the latter from Foster, McConnell & Co. in payment for certain of petitioner's shares which it received in the transaction. This part of the transaction represented merely a disposition of the stock by the other parties to the agreement after its issuance by the petitioner in exchange for the assets it received. The determination of the petitioner's cost is, therefore, not affected by this arrangement between the other parties. West Texas Refining & D. Co. v. Commissioner, supra, and Bassick v. Commissioner, supra, relied on by the Commissioner, are not controlling here, since those cases, while they arose out of somewhat similar transactions, involved the determination of the amount of gain realized by the transferor and not the cost to the transferee. Here we are not concerned with the determination of the amount received by Hazeltine Research Corporation upon the sale of its assets, but only with the amount paid by the petitioner. Transactions of the seller with third parties, are, therefore, immaterial.

The petitioner, on the other hand, while admitting that the fair market value of the shares it gave in exchange for the assets

must represent its cost contends that since its stock was actively traded in on the Curb Exchange throughout the whole of the remainder of the year 1924, a wider range of market sales should be taken into consideration, and it points out that the average price at which the stock was sold during the period from February to August was 18⅝. While it might be proper in the absence of evidence of a substantial number of sales on the day of transfer, to consider a wider range of sales, nevertheless the question for determination here is the value on that day only. Since, as we have seen, a sufficient number of shares were sold on the Curb Exchange on that day definitely to establish the fair market value of the stock, it becomes unnecessary to consider sales made on other days. In the view we have taken, it also becomes unnecessary to consider the evidence of the value of the patents and other assets purchased by petitioner, which was offered in large volume by each of the parties.

■ The assets purchased by the petitioner on February 19, 1924, included not only the patents and applications, but also the I. R. M. contract, the trade-marks and certain other contracts and contract rights. The latter, if they had any value apart from the patents, were admittedly nondepreciable assets. Consequently, their value, if any, must be deducted from the cost of all the assets in order to determine the cost basis of the patents for the purpose of computing the depreciation allowance in respect of the latter. Petitioner strongly urges that none of these additional assets had any value whatever apart from the value of the inventions which the petitioner acquired at the same time. An examination of the record, however, discloses conflicting testimony on this point. The Board upon this conflicting evidence found that 25 per cent. of the petitioner's cost was attributable to these nondepreciable assets, and it accordingly assigned 75 per cent. of the cost to the patents and inventions. This finding is binding upon us. We accordingly hold that the cost to the petitioner of the patents, inventions, and applications acquired by it was $1,832,812.50, 75 per cent. of the cost of all the assets it acquired on February 19, 1924.

■ We next come to the determination of the depreciation allowance to be made to petitioner upon the patents. The question is the period of time over which the depreciation allowance is to be made. A large amount of evidence was taken as to the expected life of the patents as of February, 1924. The testimony of petitioner's witnesses indicated a life of eight to ten years, while the Commissioner's witnesses testified to a maximum life of only five years from that date. This testimony was based upon the nature of the patents, the rapid development of the radio art and the many new devices which were being invented from time to time, rendering older processes obsolete. The Board, however, held that the depreciation allowance must be spread over a period of seventeen years, the legal life of the patents. This, in our opinion was proper. Ralston Steel Car Co. v. Commissioner (C.C.A.) 53 F. (2d) 948. Article 207 of Treasury Regulations 74 provides: "Art. 207. *Depreciation of patent or copyright.*—In computing a depreciation allowance in the case of a patent or copyright, the capital sum to be replaced is the cost or other basis of the patent or copyright. The allowance should be computed by an apportionment of the cost or other basis of the patent or copyright over the life of the patent or copyright since its grant, or since its acquisition by the taxpayer, or since March 1, 1913, as the case may be. If the patent or copyright was acquired from the Government, its cost consists of the various Government fees, cost of drawings, experimental models, attorneys' fees, development or experimental expenses, etc., actually paid. Depreciation of a patent can be taken on the basis of the fair market value as of March 1, 1913, only when affirmative and satisfactory evidence of such value is offered. Such evidence should whenever practicable be submitted with the return. If the patent becomes obsolete prior to its expiration, such proportion of the amount on which its depreciation may be based as the number of years of its remaining life bears to the whole number of years intervening between the basic date and the date when it legally expires may be deducted, if permission so to do is specifically secured from the Commissioner. Owing to the difficulty of allocating to a particular year the obsolescence of a patent, such permission will be granted only if affirmative and satisfactory evidence that the patent became obsolete in the year for which the return is made is submitted to the Commissioner. The fact that depreciation has not been taken in prior years does not entitle the taxpayer to deduct in any

taxable year a greater amount for depreciation than would otherwise be allowable."

It will be noted that this regulation specifically directs that the depreciation allowance in the case of a patent shall be spread over the life of the patent. It is quite clear from the other provisions of the regulation that it is the legal life of the patent which is referred to. A similar regulation was in effect under the Revenue Acts of 1918, 1921, and 1924, and since it was based upon statutes containing similar provisions as to depreciation allowances, it now has the force and effect of law. Old Mission Co. v. Helvering, 293 U.S. 289, 55 S.Ct. 158, 79 L.Ed. 367.

The petitioner strongly contends that the depreciation allowance in this case should be spread over a shorter period, ten years at the most, in view of the testimony as to the life of the patents to which we have referred. We think, however, that it confuses depreciation with obsolescence. Section 23 (k) of the Revenue Act 1928 (26 U.S.C.A. § 23 (l) and note) authorized the petitioner to deduct in computing its net income "a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance of obsolescence." Patents, since they are monopolies limited as to time and can have no value after their monopoly is ended, are undoubtedly exhaustible assets, and in this sense are subject to depreciation. If, however, the patent discloses a useful invention which is capable of producing the result claimed for it, it cannot be said to have been exhausted merely because some other more convenient device has taken its place in public favor. The old invention can still produce the same result for any one who desires to secure it in that way. What the petitioner really contends is that the Neutrodyne invention could be expected in 1924 to have a commercially useful life of only eight to ten years, in other words, that it might be expected to become obsolescent after that length of time. There is no contention that it would become unworkable after that period.

In the case of a group of patents consisting of a principal patent and of a number of others supplementary thereto, a depreciation allowance may be made over the expected life of the principal patent. Hyatt Roller Bearing Co. v. United States,

supra; Individual Towel & Cabinet Service Co. v. Commissioner, 5 B.T.A. 158; Hartford-Fairmont Co. v. Commissioner, 12 B.T.A. 98. The Board properly applied this rule to the present case. We accordingly hold that the petitioner was required to depreciate the cost of the entire group of patents, which we have found to be $1,832,812.50, over a period of seventeen years from February 19, 1924. Consequently, it was entitled to an allowance on this account in the year 1930 of $107,812.50, in addition to the sum of $4,829.95, representing amortization of patents purchased for cash, or $112,642.45 in all.

The Board made no allowance to the petitioner on account of the obsolescence of the Neutrodyne patents in 1930. The petitioner, however, argues that it is entitled to such an allowance. It strongly urges that the Neutrodyne invention ceased in that year to have any further practical utility or substantial earning power, being superseded by the use of the screen grid tube and the superheterodyne circuit. As we have pointed out, obsolescence is quite different from depreciation or wear and tear. It is the process of falling into disuse and relates primarily to commercial usefulness and public acceptance, rather than to what one of the witnesses in this case termed technical utility.

The record in this case discloses that in prior proceedings before the Board, as well as in a preliminary stage of this proceeding, the Commissioner admitted that the patents relating to the Neutrodyne invention had become obsolete. Over the objection of the petitioner, however, the Hearing Member permitted the Commissioner to introduce evidence as to the continuing value of these patents. The evidence so offered was merely to the effect that they continued after December 31, 1930, to have "technical utility," that is "a capacity to perform a useful function in the radio field." This, however, was beside the point. The evidence did not rebut the petitioner's evidence that by the end of the year 1930 the Neutrodyne circuit had gone completely out of use and no longer had any practical commercial value. This testimony was to the effect that Neutrodyne circuits ceased to be used after the middle of the year 1930 and that the royalties received by the petitioner in 1931 and 1932 related to receiving sets sold in prior years and to other inventions.

522

The evidence of obsolescence being uncontradicted, the Board erred in refusing the allowance. We think that the Board may have fallen into this error through failing to draw a distinction between obsolescence and complete obsoleteness. It is of course true that the Neutrodyne circuit continued capable after 1930, of performing, for those who still desired to use it, the same function in radio reception which it had theretofore performed, and it may well be that a few persons did continue to use it after that time. This, however, is far from saying that it was not obsolescent so far as practical commercial use or public acceptance was concerned, since, as we have seen, all the evidence bearing on the question indicates that it was substantially out of all commercial use by the end of that year. The evidence indicates that the value of the Neutrodyne invention and the patents relating thereto represented 85 per cent. of the value of the patents acquired by the petitioner in February, 1924. Petitioner is, therefore, entitled in 1930 to an allowance for obsolescence of these patents equal to 85 per cent. of the remaining depreciated cost, as of December 31, 1930, of all the patents acquired on February 19, 1924, the cost of which to the petitioner was $1,832,812.50.

■ Petitioner finally contends that it should be permitted to deduct as expenses in 1930 amounts expended by it in that year for legal services in connection with patent applications and patent interference proceeding. Article 207 of the Regulations, quoted above, provides that expenses incurred in securing patents are capital expenditures to be treated as a part of the cost of the patents. No option is given the taxpayer to treat them as deductible expenses. As we have already pointed out, this regulation has the force of law, since it was in effect under prior Revenue Acts, containing similar provisions concerning deductible expenses and capital expenditures. The action of the Board in holding that these items were capital expenditures and not deductible expenses was, therefore, proper.

The Commissioner's petition for review filed in No. 6170 is dismissed. The petition filed by Hazeltine Corporation in No. 6136 is sustained, the decision of the Board of Tax Appeals is reversed, and the record is remanded, with directions to redetermine petitioner's tax liability in accordance with the foregoing opinion.