JOHN F. KOONS AND M. E. KOONS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 74965. Filed March 31, 1961.

*C. Chester Guy, Esq.*, for the petitioners.
*Henry T. Nicholas, Esq.*, for the respondent.

FISHER, *Judge:* Respondent determined a deficiency in petitioners' income tax for the year 1955 in the amount of $10,991.04.

The sole issue presented for our consideration is whether expenditures made by petitioners in 1955 in the amount of $45,000 or any part thereof constituted research and experimental expenditures paid or incurred in connection with his trade or business within the intendment of section 174(a)(1) of the Code of 1954.

### FINDINGS OF FACT.

Some of the facts are stipulated and, together with exhibits filed in accordance with the stipulation, are included herein by reference.

Petitioners John F. and M. E. Koons are husband and wife, residing in Hamilton, Ohio. Their joint return for the calendar year 1955 was filed with the district director of internal revenue at Cincinnati, Ohio. John will be referred to hereinafter as petitioner or Koons.

Petitioner is 64 years old. His principal source of income in 1955 was from the Midland Advertising Agency, of which he has been an active partner since about 1925.

In 1914 petitioner started work as a newspaper reporter, and after entering military service in World War I, edited Shirt & Reveille, the first daily newspaper published by the Armed Forces. Upon discharge from the Armed Forces he wrote and financed the publication and sale of a book entitled "Billets & Bullets," containing stories about Army life.

In 1920 Koons went to Texas where he and another individual financed and operated an oil well drilling project.

Upon his return to Cincinnati, petitioner entered into a joint venture with the Cincinnati Automobile Club in editing and publishing Motor Magazine, a travel magazine. Later this magazine was taken over by the American Automobile Association.

Thereafter, petitioner was engaged by a civic committee in Cincinnati to manage a campaign to change the city from the central time zone to the eastern time zone.

In 1922 Koons started a shopping news publication in northern Kentucky, in association with another individual, which was financed and operated by them.

In 1923, petitioner handled the promotion of the Cincinnati Industrial Exposition. Upon completion of that venture, petitioner organized an advertising business in partnership with Ralph H. Quinn under the name of Koons & Company. Later the name of the business was changed to Midland Advertising Agency. Thereafter most of the enterprises in which petitioner engaged resulted from contacts made in the advertising business. When he found a product which he believed had some investment potential and there was a good, competitive market situation, he would put money into the venture.

In 1924 petitioner was retained by Kodel Radio Corporation, hereinafter called Kodel, a manufacturer of radio receivers, battery eliminators, and allied products, to negotiate the acquisition of a radio station. Said radio station was operated by petitioner for approximately 4 years on a fee basis including participation in the profits of the venture. Although petitioner was not an employee of Kodel, he was designated advertising director, had an office in its plant, and spent substantial time in advertising and selling its products. Kodel had purchased a copper oxide rectifier, which had been developed by Leiber Oxide Company. Aware of the sales potential of said rectifier, petitioner bought stock in Kodel, which he subsequently sold at a profit. Midland Advertising Agency advertised the copper oxide rectifier owned by Kodel in trade papers and a national magazine.

In 1927, Midland Advertising Agency handled the advertising for the Cooper Tire Company relating to a waterless battery trickle charger, which also was a rectifier.

In 1928, Koons became associated with an individual who was developing a switch for neon signs. Koons financed the development of the invention under an arrangement whereby he would have a one-half interest in the company in the event the invention was successful.

In connection with the handling of advertising for a client, Burger Brothers Company (now Burger Brewing Company), Midland Advertising Agency developed the theory that a chocolate malt drink would be salable and had the product made by Standard Brands. In the course of the promotion of the product, it was found that the name was already in use by a candy manufacturer who stopped them from using it. By that time, repeal of prohibition had come along and Midland purchased Burger Brewing Company. Petitioner acquired a substantial stock interest in the Burger Brewing Company and is vice president and a director of said company.

In 1928 or 1929, Midland Advertising Agency provided the funds and handled the advertising, manufacture, and selling of a patented leather hair curler in which petitioner had a percentage interest. The project was successful until short hair became stylish and the demand for the product was curtailed.

Petitioner, right after repeal, entered into a partnership for the promotion of a seltzer product known as Bromo-Fizz. Petitioner advanced all the funds for the promotion of the product in which he had a one-half interest.

In 1937, petitioner and another individual acquired the stock of Spokesman Publishing Company, publisher of trade papers known as Auto Body and The Reconditioned Car, and later petitioner and his family acquired the remaining outstanding shares of said company.

In association with his brother-in-law, who had become a distributor of bottled propane gas for use in areas where natural gas was not available, petitioner organized a distributing company known as Rural Natural Gas Company. Subsequently, they acquired and organized three additional companies which serviced propane gas distribution in areas of Ohio, Indiana, West Virginia, Kentucky, and Tennessee. Petitioner is vice president and treasurer of said companies.

Koons also became interested in the insurance business. He is president of the Automobile Insurance Agency of Cincinnati and the Automobile Club Insurance Agency of Kentucky. Koons is also treasurer of the Automobile Club Insurance Company of Columbus, Ohio, which is the parent of the aforesaid insurance companies.

Beginning in 1952 petitioner engaged in joint oil operations with other individuals by providing funds for drilling wells on leases which had been acquired by the group. This activity continued during the taxable year 1955.

Petitioner is a partner in Ager-Ager, Ltd., an operation in Santiago, Chile, engaged in the processing of seaweed into ager (agar), which is sold to meat packers and ice cream manufacturers. Said enterprise is still in existence.

Also, Koons owns a real estate development in St. Croix, Virgin Islands, which was acquired in 1954 or 1955.

In 1955, petitioner was contacted by a representative of Research Laboratories of Colorado, Inc. (hereinafter sometimes called Research Laboratories), a group of chemists, physicists, and scientists doing various types of research and discovery, to solicit his financial assistance in the further development of a titanium subdioxide rectifier. Petitioner was aware of the successful development of silicon and electrolitic rectifiers and was of the opinion that there was a good market for rectifiers.

Petitioner agreed to buy the invention known as the titanium subdioxide rectifier for $5,000 and to pay $45,000 to Research Laboratories for its services in various respects including developing the rectifier into a patentable and commercial product. (See terms of "Development Contract" executed March 11, 1955.)

On March 11, 1955, a "Sales Contract" was executed to cover the purchase of the invention which read, in pertinent part, as follows:

For the sum of five thousand dollars ($5,000.00), receipt of which is hereby acknowledged, Research Laboratories of Colorado, Inc., does hereby transfer and sell all right, title and interest in the ownership of an invention known as the "titanium subdioxide rectifier" including all improvements as developed by Research Laboratories of Colorado, Inc., and as recorded in portions of their bound laboratory notebook, designated as "Notebook Number 5," * * *

Also, on March 11, 1955, a "Development Contract" was executed to cover the development of the aforesaid invention which reads, in pertinent part, as follows:

DEVELOPMENT CONTRACT

WHEREAS, Jack F. Koons, Jr. is desirous of developing to its full market potential the titanium subdioxide rectifier recently acquired by them from Research Laboratories of Colorado, Inc., and

WHEREAS, Research Laboratories of Colorado, Inc., is desirous of providing such development service to Jack F. Koons, Jr.,

Be it then agreed that for the sum of forty-five thousand dollars ($45,000.00) payable as follows:

| | |
|---|---|
| At the signing of this agreement | $10,000.00 |
| On or before April 10, 1955 | 17,500.00 |
| On or before May 10, 1955 | 17,500.00 |
| | 45,000.00 |

Research Laboratories of Colorado, Inc., agrees to perform such work as is necessary to:

a. Define production parameters for films of titanium subdioxide functioning as rectifying cells.

b. Provide suitable counter-electrode materials and methods of application to the titanium subdioxide films functioning as rectifying cells.

c. Provide designs for the several types of rectifier units to which the titanium subdioxide rectifying cell is applicable.

d. Provide designs and methods for encasing, encapsullating or mounting the titanium subdioxide cell functioning as a rectifier, with necessary lead wires or points of electrical connection.

e. Select, devise and/or design the equipment necessary to pilot plant scale production of the titanium subdioxide cell functioning as a rectifier.

f. Select, designate or design equipment necessary to testing and inspection of the titanium subdioxide cell functioning as a rectifier.

g. *Serve as consultant to Jack F. Koons, Jr. and to customers of Jack F. Koons, Jr. in matters pertaining to the titanium subdioxide cell functioning as a rectifier.*

h. *Manufacture 10,000 titanium subdioxide rectifiers for distribution to testing agencies for product certification.*

Research Laboratories of Colorado, Inc., further agrees to do all work on a best efforts basis and to place the rectifier for testing with major government and civilian user of such products.

Be it further agreed then that Research Laboratories of Colorado, Inc., is to share on a 51% basis such profits as may be derived from the sale of the rectifiers as provided for above, and/or the sale of, exchange of, or licensing of the right, title and interest in the rectifier now owned by Jack F. Koons, Jr.

Research Laboratories of Colorado, Inc., agrees to render weekly progress reports and such other reports as may be required to apprise Jack F. Koons, Jr. of the progress of the development work.
[Emphasis added.]

J. M. ELLIOTT, Sec'y.
RESEARCH LABORATORIES OF COLORADO, INC.
JACK F. KOONS, JR.

Both of the aforesaid contracts were signed by petitioner's son, John F. Koons III, who was authorized to do so on his father's (petitioner's) behalf.

On April 21, 1955, under the terms of another document entitled "Assignment," all rights, title, and interest in the invention known as "process of making a plate oxide rectifier" for which an application for a patent was pending, were assigned and sold to petitioner by Ronald B. Howes and Robert F. Gill, Jr.

At the time the invention was acquired by petitioner in 1955 it was in a primitive laboratory state. Most of the work called for by the "Development Contract" was later finished in terms of scientific requirements, and the invention was brought to maturity as a practical device. The record does not disclose the year in which such results were accomplished, whether or when the rectifier became commercially acceptable, and whether or when it became the subject of or related to business or commercial activity. Petitioner's Federal income tax return for 1955 discloses no such business or gross receipts therefrom. The deduction in issue is listed on the line "Miscellaneous" on page 2 of the return.

On March 4, 1958, letters patent were issued covering the titanium rectifier.

All physical equipment acquired by Research Laboratories with funds furnished by petitioner was and remained the property of the laboratory. Petitioner had no rights of ownership therein.

All contacts with and reports by Research Laboratories relating to the development of the rectifier were with petitioner's son, who was acting on behalf of his father. As occasion arose, the son discussed the progress of the project with his father.

Petitioner and his son were both named John Fletcher Koons. Both have also been known by the nickname "Jack." Particularly since petitioner's son entered business, there has been confusion in the use of the names John F. Koons, Jr., and John F. Koons III.

Prior to the execution of the aforesaid contracts, petitioner and

his son had discussed them. Thereafter petitioner was advised that said contracts had been executed by his son and Research Laboratories. Petitioner did not see the written contracts until several days before the instant trial. When petitioner's son signed the aforesaid contracts, he did so on petitioner's behalf and with petitioner's authority.

On their income tax return for 1955, petitioners deducted the amount of $45,000 and itemized it as "Miscellaneous" expense on page 2 of said return. They included a separate schedule stating, *inter alia:*

that during the year taxpayer expended $45,000.00 for Research and Development on certain patents and patent application with respect to which he elects under Section 174, I.R.C. 1954, to take a current deduction and not to capitalize.

### OPINION.

Respondent, in his statutory notice, determined that the amount of $45,000 which petitioner paid to Research Laboratories of Colorado, Inc., during the taxable year 1955 was neither a research and experimental expenditure nor paid or incurred in connection with petitioner's trade or business, and hence, not currently deductible in that year under section 174(a)(1) of the Code of 1954.[1] Contesting respondent's determination, petitioner avers that for many years including 1955 his business, in addition to his interest as partner in an advertising agency, was that of an active promoter of enterprises or developer of commercial products on his own account.

---

[1] SEC. 174. RESEARCH AND EXPERIMENTAL EXPENDITURES.

(a) TREATMENT AS EXPENSES.—

(1) IN GENERAL.—A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year *in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.* [Emphasis added.]

(2) WHEN METHOD MAY BE ADOPTED.—

(A) WITHOUT CONSENT.—A taxpayer may, without the consent of the Secretary or his delegate, adopt the method provided in this subsection for his first taxable year—

(i) which begins after December 31, 1953, and ends after the date on which this title is enacted, and

(ii) for which expenditures described in paragraph (i) are paid or incurred.

(B) WITH CONSENT.—A taxpayer may, with the consent of the Secretary or his delegate, adopt at any time the method provided in this subsection.

\* \* \* \* \* \* \*

(b) AMORTIZATION OF CERTAIN RESEARCH AND EXPERIMENTAL EXPENDITURES.—

(1) IN GENERAL.—At the election of the taxpayer, made in accordance with the regulations prescribed by the Secretary or his delegate, research or experimental expenditures which are—

(A) paid or incurred by the taxpayer in connection with his trade or business,

(B) not treated as expenses under subsection (a), and

(C) chargeable to capital account but not chargeable to property of a character which is subject to the allowance under section 167 (relating to allowance for depreciation, etc.) or section 611 (relating to allowance for depletion),

may be treated as deferred expenses. In computing taxable income, such deferred expenses shall be allowed as a deduction ratably over such period of not less than 60 months as may be selected by the taxpayer (beginning with the month in which the taxpayer first realizes benefits from such expenditures). Such deferred expenses are expenditures properly chargeable to capital account for purposes of section 1016(a)(1) (relating to adjustments to basis of property).

Petitioner's position in this proceeding presents with respect to section 174, *supra*, the question of whether or not he was engaged in a "trade or business" of his own in 1955 with which the expenditures in question were connected or proximately related.

At the outset, it is essential to ascertain the meaning of section 174, *supra*, insofar as it is pertinent to the instant case, in order to determine the type of expenditure which will qualify for the special tax benefits provided thereby. Prior to the enactment of the Code of 1954 there was no statutory provision dealing with the tax treatment to be accorded research and experimental expenditures, and the taxpayer had no option to treat such costs as deductible expenses. To the extent that they were ordinary and necessary business expenses they were deductible; to the extent that they were capital they could be capitalized and were recoverable through depreciation or amortization where the useful life was determinable. *Gilliam Manufacturing Co.*, 1 B.T.A. 967 (1925); *Hazeltine Corporation*, 32 B.T.A. 110 (1935), affirmed on this issue 89 F. 2d 513 (C.A. 3, 1937); *Claude Neon Lights, Inc.*, 35 B.T.A. 424 (1937); *Hart-Bartlett-Sturtevant Grain Co.*, 12 T.C. 760 (1949), affd. 182 F. 2d 153 (C.A. 8, 1950); *Red Star Yeast & Products Co.*, 25 T.C. 321, 341, 343 (1955). In the event, however, that they were not ordinary and necessary expenses and a period of useful life could not be definitely ascertained, the amortization of such expenditures was not allowable. To alleviate this situation and to encourage taxpayers to carry on research and experimentation, section 174, *supra*, was enacted.[2]

Section 174(a) (the only section here material) provides generally (subject to conditions not here in issue) that a taxpayer has an option to treat all research and experimental expenditures paid or incurred in connection with a trade or business as deductible expenses which are not chargeable to capital account. It is clear that the intent of Congress in promulgating this section was to give taxpayers the option of treating research and experimentation expenditures in much the same manner as ordinary and necessary expenses deductible under section 162 of the 1954 Code.[3] S. Rept. No. 1622, 83d Cong., 2d Sess., p. 33 (1954). See discussion of the legislative history of section 174, 34 Taxes 541, "Tax Treatment of Research and Experimental Expenditures."

---

[2] In connection with the proposed legislation, Congressman Brown of Ohio stated:

"Very often, under present law small businesses which are developing new products and do not have established research departments are not allowed to deduct these expenses despite the fact that their large and well-established competitors can obtain the deduction * * *. This provision will greatly stimulate the search for new products and new inventions upon which the future economic and military strength of our Nation depends. It will be particularly valuable to small and growing businesses." 100 Cong. Rec. 3424 (1954).

[3] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * *

Although Congress did not define the term "trade or business," it is made clear in committee reports relating to other Code sections where the phrase is employed, viz, section 162, *supra*, that this concept was not intended to encompass all activities engaged in for profit, but was used in the realistic and practical sense of a going trade or business. Whether a taxpayer's activities constitute the carrying on of a trade or business so that expenditures related therewith may be deducted currently is essentially a question of fact requiring an examination of the particular facts in each case. See *Higgins* v. *Commissioner*, 312 U.S. 212 (1941).

It should be added, however, in the light of the circumstances of the instant case, that the privilege of charging research and experimental expenditures to current expenses under section 174(a)(1) is not limited to the taxpayer who operates his own laboratory, but also applies to one who makes use of the facilities of others for research and experimentation if in connection with his trade or business. Sec. 1.174–2(a), Income Tax Regs. Nevertheless, if section 174(a)(1) is to be applicable, the expenditures must be in connection with an existing business of the taxpayer and not a mere prospective one.

It is to be further noted that not every monetary transaction, even though entered into for the purpose of ultimate profit, comes within the concept of business as that word is used in the law of taxation.

It is our view, upon the whole record, that the expenditures for research and development here in issue were not made in connection with any existing trade or business of petitioner within the meaning of section 174(a)(1).

Petitioner argues in effect that in addition to his interest as a partner in the advertising business, he was also in the business of promoting, organizing, financing, and managing other businesses. This question is essentially one of fact. In the light of our views set forth *infra* we do not think an extended discussion of the circumstances will serve any useful purpose. The facts are set forth in our findings, and the applicable principles of law (which depend largely upon the facts of the particular case) are too well known to require elaboration.

The significant point here is that the undertaking involved in the instant case, i.e., to develop a titanium subdioxide rectifier, then in a primitive laboratory state, to the stage of commercial acceptance and use was separate and distinct from the business of the advertising partnership and from any other business with which petitioner was connected during the taxable year in question and was not in itself an existing business in that year.

It is our view that section 174(a)(1) applies to expenditures for research and experimentation in connection with an existing business

to which such research and development is proximately related, such as the development or improvement of its existing products or services, or the development of new products and services in connection with such trade or business. We do not suggest that these generalities are all-inclusive. In the instant case, however, there was no such existing trade or business. The research and experimentation was no doubt in anticipation of the organizing of a business to make business use of an end product when it reached the point of commercial acceptability. At the time the invention was bought by petitioner, however, it was in a preliminary laboratory state, and petitioner entered into the so-called Development Contract in part, at least, to get the benefit of research specialists. He went no further than this in 1955, however. It is our view that this activity was preliminary to the coming into existence of a business, and did not reach the stage of an existing business in the year in question within the meaning of section 174(a)(1). The research and development expenditures could not be "in connection with" a business which did not exist.

It is clear that the statutory phrase "trade or business" presupposes an existing business with which the taxpayer is directly connected. Expenditures made in investigating a potential new trade or business, or preparatory to entering into such business, do not, in our opinion, qualify for the application of section 174(a)(1). The principle is recognized in our repeated disallowance of such expenditures. See *Dwight A. Ward*, 20 T.C. 332, 343 (1953), affirmed on another issue 224 F. 2d 547 (C.A. 9, 1955); *George C. Westervelt*, 8 T.C. 1248, 1254 (1947); *Henry G. Owen*, 23 T.C. 377, 381 (1954); *Morton Frank*, 20 T.C. 511, 513–514 (1953); *Eugene H. Walet, Jr.*, 31 T.C. 461, 471 (1958), affd. 272 F. 2d 694 (C.A. 5, 1959). See also *McDonald* v. *Commissioner*, 323 U.S. 57 (1944).

In the light of the foregoing discussion, it is our view that the research and experimental expenditures in issue were not paid or incurred by petitioner during the taxable year in question in connection with an existing trade or business and that petitioner has not established that he is entitled to the benefits of section 174(a)(1).

No issue has been raised under section 174(b).

Assuming *arguendo* (although we have held otherwise, *supra*) that petitioner is entitled to treat any part of his expenditures of $45,000 made under the so-called Development Contract as research and experimental expenditures under section 174(a), he has failed to establish what part thereof may be so treated. The record is silent with respect to any allocation of the $45,000 to the respective services contracted to be performed under the terms of the "Development Contract." We note, however, that paragraph (g) of said contract requires Research Laboratories to "serve as consultant to Jack F. Koons, Jr., and to his customers" in matters pertaining to the rectifier; and paragraph

(h) requires the laboratory to manufacture "10,000 rectifiers for distribution to testing agencies for product certification." Manifestly, the work called for in paragraphs (g) and (h) is not of a research and experimental nature within the intendment of the statute.[4] Since there is no evidence of a proper allocation of the total expenditure of $45,000 to each of the provisions of the development contract, we are unable to ascertain the separate amounts allocable to paragraphs (g) and (h), or to any research and experimental expenditures provided for in other paragraphs of the contract, even though we accept, *arguendo*, the view that they might otherwise be entitled to section 174(a) treatment.

We add for completeness that we are satisfied that the contracts mentioned hereinabove were signed by petitioner's son, John F. Koons, Jr., under specific authorization of petitioner, and that petitioner paid the amount required under said contract for his own account. The record shows that Howes, in charge of Research Laboratories, was advised and understood that the principal in both contracts was petitioner and not his son. The son also understood that in signing the contracts and in contacting the laboratory he was acting on behalf of his father.

*Decision will be entered under Rule 50.*

---

[4] Sec. 1.174–2 (T.D. 6255, filed Oct. 3, 1957) :

DEFINITION OF RESEARCH AND EXPERIMENTAL EXPENDITURES.—(a) *In general.*—(1) The term "research or experimental expenditures," as used in section 174, means expenditures incurred in connection with taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense. The term includes generally all such costs incident to the development of an experimental or pilot model, a plant process, a product, a formula, an invention, or similar property, and the improvement of already existing property of the type mentioned. *The term does not include expenditures such as those for the ordinary testing or inspection of materials or products for quality control or those for efficiency surveys, management studies, consumer surveys, advertising, or promotions.* However, the term includes the costs of obtaining a patent such as attorneys' fees expended in making and perfecting a patent application. * * * [Emphasis added.]

