Jack Pershing Stanton and Virginia Gail Stanton v. Commissioner.
Stanton v. Commissioner
Docket No. 3135-66.
United States Tax Court
T.C. Memo 1967-137; 1967 Tax Ct. Memo LEXIS 125; 26 T.C.M. (CCH) 618; T.C.M. (RIA) 67137; June 23, 1967
Jack Pershing Stanton, pro se, 635 Val Lena, Houston, Tex., Thomas S. Loop, for the Respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined income tax deficiencies against petitioners for the years 1960 and 1962 in the respective amounts of $99.60 and $1,154.82. The only issue for decision is whether the petitioner, Jack Pershing Stanton, was engaged in a trade or business as an inventor so that certain expenditures pertaining to the construction of a "StormSafe" boat qualify for deductions as research and experimental expenses under the provisions of section 174, Internal Revenue Code of 1954. [1]
Findings of Fact Some *126 of the facts were stipulated by the parties and are so found. Jack Pershing Stanton (hereinafter called petitioner) and Virginia Gail Stanton are husband and wife who resided in Houston, Texas, at the time they filed their petition herein. They filed their joint Federal income tax returns for the taxable years 1960, 1962, and 1963 with the district director of internal revenue at Austin, Texas. Petitioner attended the University of Illinois where he majored in chemical engineering. He obtained 126 of 135 hours of credits required for a degree. During the summer of 1942, while enrolled at the University of Illinois, the petitioner worked for General Motors Corporation in its research division. He has been a registered professional engineer since 1946. Upon leaving the University of Illinois in June 1943, the petitioner was employed by the Pure Oil Company for about 8 years. Five of these years he spent in the research department. From 1943 to 1948 he served as a research engineer; from 1948 to 1949 he was acting assistant superintendent of the gasoline plant at Van, Texas; and in 1949 and 1950 he was resident chemist at the sulfur recovery and gasoline plant in Worland, Wyoming. *127 From 1950 to 1952 he was employed as an engineer with the Commercial Testing and Engineering Company in Chicago. In 1952 he entered the employment of Nalco Chemical Company and its wholly owned subsidiary, Visco Products Company. He worked for these two companies for 10 years. Petitioner managed the new products department of Nalco and the corrosion control department of Visco. During most of this period he was a petroleum chemist. In 1960 the petitioner was sent by Nalco to South America where he served as regional manager for the countries of Argentina, Chile, Uruguay and Brazil. He resigned from Nalco Chemical Company in May 1962. In September 1962, petitioner began a business called American Coordinated Technologists in which he was an industrial representative for the sale of furnaces and air filters. He also became a manufacturer's representative for Holden Furnaces and Cleveland Hydraulic Cylinder Company. In October 1963, he began working for Oilfield Research Inc. where he stayed for four and one-half months. In February 1964, he went to work for Cochran Chemical Company in Oklahoma. About five months later he formed the Chemical Division of American Coordinated Technologists *128 which manufactures, develops and markets oilfield chemicals. During his career the petitioner has had several special and technical assignments, i.e., special research engineer to the Technical Advisory Committee, Petroleum Administration for War; member of the Wright Air Force Base Committee on Thermal Stability of Jet Fuels; a lecturer at universities on "Corrosion and Its Control;" and a guest speaker for the National Association of Corrosion Engineers. Petitioner has written several technical articles for the following publications: Power, Petroleum Engineer and World Oil. Since college days the petitioner has had an interest in inventive activities. At the University of Illinois he collaborated with Dr. Thomas Baron or a project entitled "Improved Method of High-Speed Electroplating." In 1946 he disclosed by personal letter his electroplating idea to W. B. Ross of the Pure Oil Company. While employed by Pure Oil he filed disclosures with the company on a standard form covering: (1) an improved caster; (2) an improved method of sweetening mixtures of hydrocarbon oils; (3) mercaptan conversion in hydrocarbons; (4) purification of light hydrocarbons; and (5) an improvement in *129 the mercapsol process. While with Pure Oil the petitioner obtained a patent on the removal of color from sweetened hydrocarbons. He had obtained no other patents. Beginning about 1950 the petitioner entered various ideas in a notebook (labeled by him as "Invention Record Book") which he considered as a potential source of various inventions. No ideas contained in the notebook have ever been developed or marketed. In July 1960 he discussed his invention ideas with Walter and Alice Church for the purpose of forming a joint venture to exploit such ideas. However, very little has been done since that time to pursue the objective. While employed by Nalco Chemical Company the petitioner made the following disclosures: (1) an improved chemical agent for stabilizing middle-distillate fuel oils against formation of objectionable color and sludge during storage and (2) an oil well circulator. With both Nalco and Visco the petitioner signed agreements obligating himself to assign his right, title and interest in any inventions arising out of his employment with those companies. No ideas which the petitioner formulated while employed by various corporations from 1943 through 1962 were released *130 to him as his own property. Nor has the petitioner received any royalty or other income from any of his ideas. In early 1962, while on the island of Tierra del Fuego, the petitioner conceived the idea of the "StormSafe" boat, utilizing an unconventional design of hull construction. In March 1962 he drafted the first plans for the boat, which he called the "Cradle-Craft." In May, after resigning from Nalco, the petitioner visited various manufacturers of marine motors, such as the Gray Marine Motor Company. In July 1952, he and his sons began in the back yard of their Houston home the construction of a prototype of a "StormSafe" boat. [2] The hull construction process was unique in that metal sheets were used. Petitioner employed welders. He consulted an electromechanical engineer. He paid his younger son to construct a 48 inch scale model of the "StormSafe" hull concept. *131 After the experimental prototype of the "StormSafe" hull had been formed, square holes were cut in the side of the hull, hinged doors constructed and inserted in the holes and home-fabricated hydraulic equipment and wheels inserted in the hull and a watertight, retractable-wheel-cabinet built in the hull. The purpose of these fabrication steps was to determine the practicality of developing amphibious versions of the "StormSafe" hull concept. Petitioner contacted the United States Navy, the Small Business Administration, and a Thomas Matthews and others in attempts to obtain financial and other assistance in completing the "StormSafe" boat. He was unsuccessful. Petitioner made a preliminary patent search in Stillwater, Oklahoma, with respect to the features of the boat. He has never employed a patent attorney or filed a patent application covering the features of the boat. At the end of 1963 the "StormSafe" boat was not considered marketable. It was not proven to be operational in water during 1962 or 1963. It did not have anti-roll stability. In 1962 and 1963 the petitioner spent $5,935.16 and $1,148.92 on the construction of the boat. In 1962 and 1963 the amounts of $4,135.76 *132 and $1,969.88 were claimed by the petitioner in his income tax returns as research and experimental expenses incurred in carrying on a trade or business. Respondent disallowed the claimed losses with the following explanation: It is determined that the activities of "Storm-Safe Boat Builders" did not constitute the operation of a trade or business, and the loss claimed is disallowed. Petitioner was not engaged in the business of inventing or boat building for profit in the years 1962 and 1963. Opinion Petitioner seeks to deduct research and experimental expenditures made in constructing the "StormSafe" boat. He argues that he was an established inventor who was in the trade or business of "inventing for profit" during and prior to the years 1962 and 1963. Petitioner's position is summarized in the following two paragraphs contained in his original brief: The petitioners call the attention of the Court and the Commissioner to the importance of invention, research and development to national security an national progress. Failure of the Commissioner to recognize that invention, research and development are inherently of non-predeterminable duration and cost, and frequently *133 produce processes or products of indeterminate life, leads to tax rulings which are stifling to such enterprise. The application, to inventing-for-profit, of the same criteria as applied to a business such as a grocery store establishment, which normally involves a shortterm, predictable period of "preparation to enter the business", is inimical to invention and can lead to great hardship for the ardent inventor. The normal tendency in invention, research and development is to pour all available funds into a promising development or idea (particularly because market-timing, and competition for earliest date of filing for patent protection, are vital to success). Also, the tendency is to be optimistic in estimating time-lapse to initial sales. Therefore, the individual, private or corporate, who expected to derive sales from, or to abandon, a project in a given year, frequently finds that time required to get results is longer than anticipated… or uncovers a new finding which advises expansion of the investigation before attempting marketing. Respondent, on the other hand, claims that the petitioner was not in the trade or business of inventing for profit or of building a boat *134 for profit prior to or during the years in question. The specific provision for the deduction of research and experimental expenses was first enacted in 1954 as section 174.[3] Under this section taxpayers may elect to deduct research and experimental expenditures which are paid or incurred during the taxable year in connection with a trade or business. It is clear that the benefits of section 174 are intended to be used in the realistic and practical sense of a going trade or business. See Martin Mayrath, 41 T.C. 582 (1964), affd. 357 F. 2d 209 (C.A. 5, 1966); John F. Koons, 35 T.C. 1092 (1961); and 100 Cong. Rec. 3425 (1954).
In order to prevail the petitioner has *135 the burden of connecting such expenditures to an existing trade or business. From the entire record we think the petitioner has failed to establish that his activities which gave rise to the expenditures constitute the conduct of a trade or business of inventing preponderance of the evidence supports this conclusion. What constitutes a trade or business is, of course, a question of fact to be determined from all the facts and circumstances in each case. Higgins v. Commissioner, 312 U.S. 212 (1941); and Martin Mayrath, supra.Certainly one may be engaged in business as an inventor, with the expectation of profitable exploitation of one's inventions through royalties, sale of patents or otherwise. Cf. Harold T. Avery, 47 B.T.A. 538 (1942), where the taxpayer, who for a period of 17 years procured 12 patents, sold or granted rights in 5 patents, and was determined to have held such patents in the ordinary course of his business. By contrast, however, see John F. Koons, supra, where the taxpayer was not in an existing business as an *136 inventor; and Industrial Research Products, Inc. 40 T.C. 578 (1963), in which this Court said that the "mere working on inventions during the year in question with no activity of offering them for sale or license would be insufficient to show engagement in an inventing business." Neither the petitioner's testimony [4] nor the documentary evidence persuades us that he was engaged in the business of inventing. All in all, there is simply insufficient proof to convince us otherwise. In our view the facts in this case lend themselves to that line of cases holding that expenditures made in investigating a potential new trade or business, or preparatory to entering into such business, are not deductible. McDonald v. Commissioner, 323 U.S. 57 (1944); John F. Koons, supra; Eugene H. Walet, Jr. 31 T.C. 461 (1958), affd. 272 F. 2d 694 (C.A. 5, 1959); and Morton Frank, 20 T.C. 511 (1953). Although the petitioner had *137 a conglomeration of ideas set out in his so-called "Invention Record Book," not a single idea has ever been developed and none has ever reached the market place. He has never received any income from any of these ideas. All disclosures of ideas and inventions made while petitioner was in the employment of Pure Oil Company, Nalco and Visco became the property of the corporations. None of these ideas or inventions were released to him as his own property. From the record it appears that from 1943 to May 1962 the petitioner was never selfemployed. With respect to the "StormSafe" boat we regard the petitioner's activities as sporadic and not of sufficiently sustained character to qualify as engaging in the trade or business of an inventor or as a boat builder. The petitioner had built only a rowboat prior to 1962. He never attempted to obtain a patent on the hull design of the "StormSafe" boat. He never consulted a patent attorney. He testified that the boat in its experimental stage was not marketable. Its feasibility has never been proven. None of petitioner's exhibits show that any attempt was made to market the boat, but only show unsuccessful attempts to raise investment capital. *138 Petitioner frankly admitted that he did not expect to realize a profit from the boat during the years in issue. He even conceded that it was not marketable at the time this case came to trial. In short, there has been no serious attempt by petitioner to profitably exploit the "StormSafe" boat or, for that matter, any other inventions, and any expectation of profit in his mind borders on the brink of pure speculation. See Lamont v. Commissioner, 339 F. 2d 377 (C.A. 2, 1964); and Margit Sigray Bessenyey, 45 T.C. 261 (1965), affd. 379 F. 2d 252 (C.A. 2, June 1, 1967). Moreover, even if we were to assume that the petitioner is in the business of inventing, there is a point beyond which his propensity to experiment with the "StormSafe" boat must be viewed as taking on some of the characteristics of a hobby. Cf. Martin Mayrath, supra. Accordingly, in light of all the facts and circumstances disclosed by this record, we are constrained to hold that the petitioner has failed to prove he was in an existing trade or business of inventing or of boat building during the years 1962 and 1963. Cf. Myron Edwin Cherry, T.C. Memo. 1967-123 *139 (June 2, 1967). Decision will be entered for the respondent. Footnotes
1. All references herein are to the Internal Revenue Code of 1954 and the regulations promulgated thereunder.↩
2. In a letter to Gray Marine Motor Company dated July 30, 1962, the petitioner described the boat as follows: You will recall my stating that a major portion of the StormSafe hull is formed by an unusual process of winding two continuous sheets of hull-forming material into a futuristic, seabass-like shape. The boat itself is unusual in that all its surfaces, including its top deck, are smoothly curved for ideal distribution of applied stresses and in that a major portion of the hull is formed from two coil sheets without cutting to shape and with only two short seams (at the stern). We have decided to build our production prototype of aluminum and to propel it with an inboard-outboard drive. We are forming a 31 footer having a double wall with interior ribs of square aluminum tubing and insulated with polyurethane foam.↩
3. SEC. 174. RESEARCH AND EXPERIMENTAL EXPENDITURES. (a) Treatment as Expenses. - (1) In General. - A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.↩
4. We do not doubt petitioner's credibility. He impressed us as a sincere and candid person.↩