William S. Scull, II, and Elizabeth N. Scull v. Commissioner.
Scull v. Commissioner
Docket No. 3070-62.
United States Tax Court
T.C. Memo 1964-224; 1964 Tax Ct. Memo LEXIS 113; 23 T.C.M. (CCH) 1353; T.C.M. (RIA) 64224; August 25, 1964
*113 The petitioner on behalf of himself and other holders of stock and securities of Penndale entered into an agreement to sell such securities to another corporation which owned the controlling interest in Penndale. The agreement provided that the recited consideration was the purchase price for the stock and other securities. The agreement also provided that there should be delivered mutual releases by the petitioner and Penndale of obligations under the petitioner's contract of employment with Penndale. Held: That no portion of the recited consideration constituted ordinary income received by the petitioner for cancellation of his employment contract. Held, further, that the petitioner has not shown that certain payments made to a chemist constituted research or experimental expenditures deductible under section 174 of the Code. Raymond J. Bradley, and Myles H. Tanenbaum, for petitioners. Albert Squire, for respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined a deficiency in income tax for the taxable year 1959 in the amount of $27,895.29. The issues for decision are (1) whether some part of $350,000 received in 1959 by petitioner on *114 behalf of himself and other members of the Scull group in a transaction purporting to be a sale of stock and securities of Penndale, Inc. in reality constituted consideration paid to the petitioner for the cancellation of his employment contract with Penndale, Inc.; and (2) whether the petitioner may deduct under section 174 of the Internal Revenue Code of 1954 an amount of $5,000 as research or experimental expenditures paid in connection with his trade or business. Findings of Fact The petitioners are husband and wife, residents of Bryn Mawr, Pennsylvania. They filed a joint Federal income tax return for the taxable year 1959 with the district director of internal revenue at Philadelphia, Pennsylvania. Hereinafter William S. Scull, II, will be referred to as the petitioner. From February 28, 1951, until July 17, 1959, the petitioner was employed by Penndale, Inc. (hereinafter referred to as Penndale) as its president. Penndale is a New Jersey corporation doing business in Pennsylvania. It is engaged in the production and sale of instant coffee and other commodities. It was originally founded under the name Jet Coffee Company. It keeps its accounts on the basis of a fiscal year ending *115 on the last day of February. Petitioner was an original incorporator of Penndale. From 1951 to 1959 petitioner was a substantial stockholder in Penndale and a director. His contract of employment with Penndale was dated February 28, 1951, and provides in part as follows: 1. Company agrees to employ Scull and Scull agrees to devote his full time, energy and attention to the work of the Company in such capacity as the Board of Directors of the Company shall designate. 2. As compensation for his services, Scull shall receive from the Company a salary at the rate of Twenty Thousand Dollars ($20,000.00) per year, and in addition thereto shall receive amounts equal to the following: 10% of the net profits of the Company from $50,000. to $100,000. 15% of the net profits of the Company from $100,000. to $200,000. 5% of the net profits of the Company in excess of $200,000; provided, that in no event shall Scull's aggregate compensation, including both salary and participation in profits, exceed the sum of $100,000. in any one year. * * *
3. This agreement shall become effective immediately upon execution, except that the salary and other compensation of Scull shall not begin until April 1, 1951. *116 This agreement shall continue in effect for a period of ten (10) years from April 1, 1951, and thereafter shall continue from year to year upon the same terms and conditions, unless either party shall give to the other written notice of intention to terminate the contract at least ninety (90) days prior to the conclusion of the original term hereof, or any renewal thereof. In February 1959 Penndale had outstanding 58,752 shares of common stock. In addition, its stockholders had options (sometimes referred to as common stock option rights) to purchase 22,250 shares at $5 per share, and options (sometimes referred to as pre-emptive common stock option rights) to purchase 1,000 shares at $2.50 per share, as set forth in the following tabulation: $5
$2.50
Stockholder
Common
Opt.
Opt.
Donner Foundation
29,260
6,650
299
Kirsopp
2,750
625
28
Kidder Peabody & Co.
1,987
4,515
203
Scull
16,761 *
8,960
403
A.D. Little Foundation
2,900
600
27
Burge
1,100
250
11
Vulcan
1,000
Goodman
1,000
200
9
Irwin
1,330
300
14
Laughlin
330
75
3
Weiser
330
75
3
Maes
1
Ranck
1
Gillingham
1
Selby
1
58,752
22,250
1,000
On February 25, 1959, Paxton & Gallagher Co., a Delaware Corporation located in *117 Omaha, Nebraska, (acting through W. Clarke Swanson and Associates) contracted with the Donner Foundation, Kidder Peabody & Co., and C. B. Kirsopp (referred to as the Donner group) to purchase their shares of common stock of Penndale for $10.0808 per share, and all their option rights for $1 per option. The contract provided for consummation of the sale on May 15, 1959, and it was so consummated. In that transaction Paxton & Gallagher Co. paid approximately $1,000,000 and acquired from such parties, in addition to the stock and option rights, about $700,000 principal amount of outstanding indebtedness of Penndale. By letter dated March 19, 1959, addressed to the petitioner by Cecil Johnson, who was located in Omaha, Nebraska, and was legal counsel for Paxton & Gallagher Co. and Swanson and Associates, Johnson offered to purchase on behalf of Swanson and Associates all of the petitioner's Penndale stock and option rights on the same terms as in the case of the purchase from the Donner group. Similar offers were made on the same date to the other stockholders. Of such remaining stockholders, the Arthur D. Little Foundation, Eleanor Burge, E. Budd Laughlin, and Aaron Weiser (none of *118 whom was related to petitioner or was an employee of Penndale) joined with the petitioner for the purpose of negotiating for the sale of their stock, and authorized Bernard Eskin, [1] an attorney, to act on their behalf in dealing with Paxton & Gallagher Co. and Swanson and Associates. Upon the advice of Eskin the offer of March 19, 1959, was not accepted by the group (hereinafter referred to as the Scull group). On March 24, 1959, the petitioner was relieved of his duties as president of Penndale, but continued to serve the corporation as a consultant, continuing until July 17, 1959, to receive salary paid pursuant to his contract of employment of February 28, 1951. Alexander Barbieri, an attorney located in Philadelphia, Pennsylvania, and who on or about March 24, 1959, became secretary and general counsel of Penndale, also engaged in negotiations with the Scull group with respect to the purchase of the Penndale stock of that group, acting on behalf of Paxton & Gallagher Co. and Swanson and Associates. In such negotiations *119 he received instructions from Johnson. On May 11, 1959, Barbieri, as general counsel for Penndale, rendered an opinion that the stock options were void as not having been properly authorized by the corporation, and he so advised Paxton & Gallagher Co. on May 19. On behalf of Penndale suit was brought in a Federal court to have the validity of the options determined. The petitioner and others filed a motion to dismiss the suit. Eventually that suit was terminated without decision since in the meantime an agreement had been reached with regard to the sale of the stock. By letters dated May 20, 1959, Johnson renewed the same offer as was contained by his letters of March 19, 1959, to purchase the stock and options held by the Scull group and to also purchase any debentures of Penndale held by them. This offer was also rejected. On May 27, 1959, petitioner went to Europe and stayed until about the middle of July, 1959. In the interim, negotiations with respect to the sale were conducted by Eskin on behalf of the petitioner and his group, with Barbieri representing Paxton & Gallagher Co. and Swanson and Associates. Barbieri had instructions from Johnson to offer $10.0808 for each share *120 of stock and $1 for each stock option, and in discussions with Eskin he offered such price. Eskin, in the discussions, rejected such price, since it had twice before been rejected, and sought a price of $15 for each share of stock. In a discussion between Johnson and Scull at a meeting held on May 15, 1959, the petitioner indicated his willingness to dispose of his employment contract, but stated that he wanted to be paid for it. Johnson had advised Paxton & Gallagher Co. that petitioner's employment contract was not terminable and that petitioner would have to be paid for it. Johnson instructed Barbieri to adhere to a price of $10.0808 per share for the stock and $1 for each stock option, and authorized Barbieri to offer petitioner for his employment contract an amount of $60,000. He later authorized Barbieri to offer increasing amounts up to $130,000 therefor. Barbieri and Eskin discussed payment for the employment contract and a proposal to spread such payment over a 3 to 5-year period to reduce the petitioner's tax burden. Also discussed in the negotiations was the question of whether the petitioner would enter into a covenant not to compete in the coffee business in the Philadelphia *121 area. While the parties discussed specific items, there was no meeting of the minds as to any specific amount to be paid for any specific item. Rather, each side negotiated in terms of a gross price to be paid. In the negotiations the matter of a mutual release of the obligations of the employment contract, as a condition to the transaction, was discussed. The negotiations culminated in an agreement dated July 14, 1959, prepared by Eskin and executed by the petitioner on behalf of the Scull group and by Gilbert C. Swanson on behalf of Paxton & Gallagher Co. Such agreement provides in part as follows: 1. Seller agrees to sell and deliver to Buyer and Buyer agrees to purchase the following securities of Penndale, Inc., presently issued and outstanding in the names of the individuals and in the amounts as indicated: Options to
Purchase
4 1/2% Ten
Four Year 5%
Name
Shares
Shares
Year Notes
Debentures
Original Principal
Amount
Wm. S. Scull
16,763
8,960
None
None
The A.D.L. Foundation
2,900
600
None
None
E. Budd Laughlin
330
75
$ 3,000
None
Mrs. Eleanor L. Burge
1,100
250
10,000
$5,000
Aaron Welser
330
75
3,000
None
Totals
21,423
9,960
$16,000
$5,000
2. As the purchase price for the foregoing securities Buyer agrees to pay to *122 Seller the sum of $350,000, in cash at settlement, as hereinafter provided. * * *
4. At settlement: (a) Seller shall deliver to Buyer: (i) Certificates representing all the shares of stock to be sold hereunder, accompanied by appropriate assignments to Buyer. (ii) Instruments evidencing the options to purchase stock sold hereunder accompanied by appropriate assignments to Buyer. (iii) The notes to be sold hereunder accompanied by appropriate assignments to Buyer. (b) Buyer shall pay to Seller the sum of $350,000 by certified check to Seller's order. (c) Seller shall deliver to Buyer instrument executed by Seller acknowledging that Penndale Inc. has no further obligations to Seller under a certain agreement dated February 28, 1951, that said contract is cancelled and the employment thereunder is terminated as of the date of settlement, and generally releasing Penndale Inc. from any and all obligations of any nature to Seller. (d) Buyer shall deliver to Seller instrument executed by Penndale Inc. acknowledging that Seller has no further obligation to Penndale Inc. under the said agreement dated February 28, 1951, that the said agreement is cancelled and Seller's employment thereunder *123 is terminated as of the date of settlement, and generally releasing Seller from any and all obligations of any nature to Penndale, Inc. Settlement in accordance with the above agreement was made on July 17, 1959. While the agreement does not refer to the pre-emptive common stock option rights, and while there apparently were no documents evidencing them, it was understood by the parties that the sellers did not retain any such rights. Payment of the amount of $350,000 was made by two checks of Paxton & Gallagher Co., one in the amount of $25,000 and one in the amount of $325,000, each made payable to the petitioner for himself personally and as agent. The final payment was made on July 17, 1959. These checks were deposited in the petitioner's bank account. Eskin computed the portion of the proceeds which each member of the Scull group was to receive on the basis of $12 per share of stock and $7 for the common stock option rights, after taking into account his legal fee of $10,000. By letters [2] *125 dated July 17, 1959, he remitted $6,225 to Weiser, $6,225 to Laughlin, $25,750 to Eleanor Burge, and $39,000 to the Little Foundation. This left $272,800 of the $350,000. Of this Eskin received *124 $10,000 as his legal fee, leaving the petitioner $262,800. Pursuant to the agreement Penndale and the petitioner entered into an agreement dated July 17, 1959, terminating their employment contract of February 28, 1951. Such agreement provides as follows: Scull has heretofore been employed by Penndale, under an agreement dated February 28, 1951, which agreement was to continue in effect until February 28, 1961. Scull has also heretofore served Penndale in various capacities, including a membership on the Board of Directors and as President of the corporation. The parties now desire to sever their relationship, to terminate the employment under the said contract and to exchange mutual releases. NOW, THEREFORE, the parties hereto in consideration of the mutual promises herein contained and intending to be legally bound, agree as follows: 1. The contract of employment dated February 28, 1951, between the parties is hereby cancelled and terminated *126 as of the date hereof. 2. Penndale acknowledges that as of the date hereof it has no claims of any nature against Scull and Penndale hereby releases Scull from any and all obligations of any nature which may exist. 3. Scull acknowledges that as of the date hereof he has no claims of any nature against Penndale and Scull hereby releases Penndale from any and all obligations of any nature which may exist. The minutes of a meeting of the board of directors of Penndale held on July 17, 1959, contains the following resolution: RESOLVED that the company purchase the employment contract of William S. Scull dated February 28, 1951, which agreement under its terms would have continued in effect until February 28, 1961, for the price of $109,352.02, and Paxton and Gallagher Company (a Delaware Corporation) is hereby authorized to make purchase of said contract and to make charge therefor against Penndale, Inc. At an undisclosed time Penndale paid to Paxton & Gallagher Co. an amount of $109,352.02, and in its income tax return for its fiscal year ended February 28, 1960, it deducted such amount which it attributed be the petitioner's employment contract. The amount of $109,352.02 was computed *127 by attributing $10.0808 to each share of stock and $1 to each common stock option right and each pre-emptive common stock option right, resulting in a total of $226,367.98, and subtracting that figure, and the amount of $14,280 on account of the notes and debentures, from the total amount of $350,000 paid. Penndale did not furnish the petitioner a Form 1099 (Information Return), pursuant to section 6041 of the Code and sections 1.6041-1 and 1.6041-2 of the Income Tax Regulations, advising him that any portion of the total consideration paid pursuant to the agreement of July 14, 1959, was being treated by Penndale as a payment for his employment contract. In its income tax return for the taxable year ended February 28, 1960, Penndale reported a net loss of $61,184.84, after deducting $109,352.02 which it attributed to the petitioner's employment contract. In the taxable years 1955 to 1959 the petitioner received salary from Penndale in the respective amounts of $20,000, $28,154.82, $11,000, $43,220.96, and $33,355.31. On May 1, 1961, Penndale merged into Paxton & Gallagher Co., which thereafter changed its name to Butter-Nut Foods Co.
In the joint income tax return for the taxable year *128 1959, the petitioner reported compensation received from Penndale in the amount of $33,355.31. He reported long-term capital gain of $236,759.23 from the sale on July 17, 1959, of 16,763 shares of Penndale stock, showing dates of acquisition as "various", sales price of $262,800 (after deduction of $10,000 expense of sale), and cost of $26,040.77. In the notice of deficiency the respondent increased by $109,352.02 the amount of the ordinary income reported by the petitioner with the explanation "To add to ordinary income amount received from taxpayer's employer for cancellation of employment contract. Reported erroneously as long term capital gain". Consistently, the respondent excluded the same amount from long-term capital gain (reducing the reported gain by one-half of that amount, or $54,676.01). Sometime in 1958 a business broker introduced the petitioner to Jacques Martinat, a perfume and flavor chemist with some thirty years' experience, who was engaged in developing a process for extracting the oil soluble aromatics from roasted and ground coffee to be added to instant coffee to make it taste more like regular coffee. In 1958 petitioner was still employed by, and was president *129 of Penndale. He took samples of Martinat's product to laboratories of Penndale for study, and recommended to the board of directors of Penndale that they enter into a partnership arrangement with Martinat. The board of directors of Penndale decided against undertaking the project at that time. Thereupon the petitioner personally agreed with Martinat to make payment to Martinat of $500 in order that Martinat could continue for a month to conduct experiments in connection with the process. Petitioner continued to make payments to Martinat, the total payments being as follows: Date of Payment
Amount
February 6, 1959
$ 500
February 23, 1959
500
April 20, 1959
1,000
June 5, 1959
2,000
July 10, 1959
1,000
Total
$5,000
It was the petitioner's purpose to test the product of the process and to have such product tested by others, the intention being that if the process should be successful a partnership arrangement would result between him and Martinat. The petitioner also retained the hope that this process might be acquired by Penndale under the new management. In a letter of April 14, 1959, to L. W. McBride, vice president of Penndale, the petitioner stated in part: As you know, I have been working for *130 some time in cooperation with an inventor who has developed a process for extraction of coffee flavoring which I think would be highly useful in the instant coffee business. The present status of the matter is that Steve Chambers and I hold an option to acquire an interest in this process. The option will expire on April 26, 1959. If the option is to be taken up, it will require an expenditure of approximately $150,000 to build a plant and exploit the secret formula. This entire matter has previously been brought to the attention of the Board of Directors of Penndale and it was expressly rejected as an investment for Penndale. However, in view of the change of management, I thought it appropriate to bring the matter to your attention. I would like to know very promptly whether Penndale is interested in this proposition, including the necessary investment funds, or in the alternative whether Penndale would be interested in entering into a contract for the production of the oil extract. In view, of the short time remaining for exercise of the option, any decision to be made by Penndale must be made immediately. During 1959 the petitioner presented to a number of manufacturers of coffee *131 both in this country and abroad, for testing, samples of instant coffee treated under the Martinat process. He and Martinat discussed possible plant locations. In the summer of 1959 petitioner and others formed a corporation, Nestle, Inc., in order to exploit the Martinat process, the petitioner acquiring a stock interest in the corporation. In his income tax return for the taxable year 1959, the petitioner deducted in Schedule C (Profit (or Loss) from Business or Profession) $5,000 as other business expenses with the explanation "Research & Development". In the notice of deficiency the respondent disallowed the claimed $5,000 deduction "since not connected with an operating trade or business". Ultimate Findings No part of the $350,000 received by the petitioner during the taxable year 1959, pursuant to the agreement of July 14, 1959, constituted consideration for the cancellation of his contract of employment with Penndale. The amount of $5,000 paid by the petitioner to Martinat in the taxable year 1959 did not constitute research or experimental expenditures incurred by petitioner in connection with his trade or business. Opinion The principal issue is whether any portion of $350,000 *132 received by the petitioner in 1959 from Paxton & Gallagher Co., pursuant to the agreement of July 14, 1959, constituted consideration for the cancellation of petitioner's contract of employment with Penndale. Any amount so received would, of course, represent ordinary income. Victor H. Heyn, 39 T.C. 719. The respondent in the notice of deficiency determined that $109,352.02 of such amount was consideration for the cancellation of the employment contract, but on brief states, in effect, that in the light of the evidence such amount is excessive and that a reasonable approximation of the amount paid for the employment contract would be about $75,000. The petitioner contends that the full amount of $350,000 received was consideration for stock, stock option rights, notes, and debentures of Penndale, which he and other members of the Scull group transferred to Paxton & Gallagher Co. The issue is essentially factual. From a consideration of the agreement of July 14, 1959, and all the other evidence in the case, we have concluded and have found as a fact that no part of the $350,000 represented consideration paid to the petitioner for the cancellation of his contract of employment with *133 Penndale. The agreement of July 14, 1959, clearly states that the sum of $350,000 is the purchase price for the various securities. It is true that such agreement provided for the cancellation of the contract of employment and provided that Penndale and the petitioner should execute instruments mutually releasing each other from the obligations of the contract of employment, but the agreement does not provide for any consideration for the cancellation of such contract. At the trial of this case there was received evidence regarding the negotiations leading up to the agreement of July 14, 1959, including the testimony of the persons who negotiated the agreement, for the purpose of determining whether the agreement reflected the substance of the transaction. We have set forth in some detail in the Findings of Fact the various items discussed in the bargaining. The evidence shows that the representatives of Paxton & Gallagher Co. twice offered to purchase the Penndale stock for $10.0808 per share and each option right for $1, but that these offers were refused by the Scull group. The Scull group demanded $15 per share. There never was a meeting of the minds of the contracting parties *134 as to any specific price per share for the stock or per option right. Rather, representatives of both parties testified that they negotiated in terms of a lump sum to be paid. There were discussions regarding consideration to be paid for the cancellation of the employment contract and also discussions regarding a mutual release of the obligations thereof. Eskin testified that in the negotiations no figure wasmentioned with respect to the cancellation of the contract. Harbieri testified that a figure was mentioned. In any event, we are satisfied from the evidence that there was no meeting of the minds of the parties with respect to the payment of any amount for the cancellation of the contract of employment. It is significant, we think, that in the agreement between the petitioner and Penndale cancelling the contract of employment there is no mention of any consideration passing except the mutual releases of the obligations under the contract. It is evident that Paxton & Gallagher Co., which had recently acquired control of Penndale, was desirous of having Penndale relieved of its obligation to pay the petitioner an annual salary of $20,000, plus a percentage of profits. On the other *135 hand, Eskin, the petitioner's attorney who acted on behalf of him and the [*] members of the Scull group in the [*] testified that he was interested in obtaining the petitioner's release from the employment contract, since the petitioner was interested in other ventures, including the Martinat process, and since there was the possibility that so long as petitioner was employed by Penndale such [*] ventures might constitute a breach of his employment contract and that any profits from such other ventures might belong to Penndale. In making the distribution of the $350,000 Scull and Eskin did not treat any portion of the amount as being received for the cancellation of the employment contract. Indeed, under the terms of the agreement of July 14, 1959, the other members of the Scull group could have prevented the petitioner from appropriating to himself any greater amount than his proportionate share based upon his stock ownership. The full amount of $350,000 was treated by the Scull group as consideration for the stock, stock options, and obligations of Penndale, each member of the group receiving his proportionate share based on his ownership of the securities, after payment of an attorney's *136 fee. Actually, the petitioner received a slightly lesser portion, based on his stock ownership, than did the other members of the group. Under the circumstances, it is not decisive that on July 17, 1959, Penndale adopted a resolution to purchase the petitioner's contract of employment for $109,352.02, authorizing Paxton & Gallagher Co. to purchase the contract and make charge therefor against Penndale, and that at some undisclosed time Penndale paid Paxton & Gallagher Co. an amount of $109,352.02. These actions on the part of Penndale have not been shown to be the result of any agreement between Penndale and the petitioner. As stated, the cancellation agreement did not recite any monetary consideration. In this connection we note that the resolution was not adopted by Penndale until 3 days after the agreement of July 14, 1959, fixing the full $350,000 as a payment for stock and other securities of Penndale. And we also note that Penndale did not furnish the petitioner an Information Return (Form 1099), advising him that any portion of the total consideration paid pursuant to the agreement of July 14, 1959, was being treated by Penndale as a payment for his employment contract. We hold *137 that the respondent erred in eliminating from the petitioner's capital gain for the taxable year 1959 the amount of $109,352.02 and treating such amount as ordinary income. The remaining issue is whether the amount of $5,000 paid by petitioner to Jacques Martinat in 1959 is deductible under section 174 of the Code, [3] *138 as research or experimental expenditures. The respondent disallowed the deduction as not being connected with "an operating trade or business." The petitioner, while recognizing that section 174(a) is explicit in providing that the deduction is limited to expenditures incurred "in connection with his trade or business," contends that the requirement is satisfied if the research or development arises out of efforts to produce financial gain, as distinguished from a hobby or other noncommercial activity. While neither the statute nor the regulations defines "trade or business," we have heretofore given careful consideration to this question and have held that the phrase contemplates a going trade or business. In John F. Koons, 35 T.C. 1092, we stated in part: Although Congress did not define the term "trade or business," it is made clear in committee reports relating to other Code sections where the phrase is employed, viz, section 162, supra, *139 that this concept was not intended to encompass all activities engaged in for profit, but was used in the realistic and practical sense of a going trade or business. Whether a taxpayer's activities constitute the carrying on of a trade or business so that expenditures related therewith may be deducted currently is essentially a question of fact requiring an examination of the particular facts in each case. See Higgins v. Commissioner, 312 U.S. 212 (1941). See also Martin Mayrath, 41 T.C. 582, appeal pending (C.A. 5). The evidence does not disclose the precise relationship between the petitioner and Martinat or what agreement there may have been in connection with the payments to Martinat. The petitioner testified that the arrangement was "rather loose knit." At the time these expenditures were made the petitioner was employed on a full time basis by Penndale under a contract of employment. He testified that he was devoted entirely to the interests of Penndale and that he was not, either as an individual or as a partner, engaged in the coffee business. He further testified, in effect, that it was his hope that Penndale would become interested in the Martinat process. At another point *140 he stated that if the process proved successful a partnership between him and Martinat would result. In a letter dated April 14, 1959, he advised Penndale that he and another individual had an option to acquire an interest in the process, and inquired whether Penndale would be interested in such option. We are not advised as to Penndale's decision. However, it is apparent that Penndale did not take over the process, inasmuch as the evidence shows that in the summer of 1959 the petitioner and others formed a corporation, Nestle, Inc., to exploit the process. Under these circumstances, we cannot conclude that the payments to Martinat constituted research or experimental expenditures in any trade or business of the petitioner. At most the petitioner's expenditures, and his activity with respect to the process, were preliminary to the possible formation of a business. See John F. Koons, supra.The statements made by the petitioner in his letter to Penndale indicate the possibility that the payments in question may have been made in order to acquire an option to obtain an interest in the Martinat process. Be this as it may, it is sufficient to state that the petitioner has not shown that *141 the amounts are deductible under section 174 or any other section of the Code. The respondent did not err in denying the claimed deduction. Decision will be entered under Rule 50. Footnotes
*. Petitioner acquired 2 additional shares sometime prior to July 14, 1959.↩
1. Bernard Eskin was secretary and general counsel of Penndale but was succeeded in that capacity on or about March 24, 1959, by Alexander F. Barbieri, another attorney.↩
2. The letter to Eleanor L. Burge which is typical and which sets forth the manner of apportioning the proceeds, is as follows: The settlement for the sale of the Penndale stock took place today (Friday). I have discussed with Mr. Scull the appropriate method of apportioning the total purchase price of $350,000 among the various minority shareholders. Of course, the outstanding notes will be paid first. These amount to $14,280, in total, so that the net amount for distribution to shareholders is $335,720. Mr. Scull and I concluded that the appropriate method of distributing this amount among the shareholders is to value the stock at $12.00 per share including a value of $7.00 per share for the $1.00 [$5.00] options. On this basis there will be a small amount in excess of $12.00 per share which will be used to defray the costs involved in the transaction inculding counsel fee. Mr. Scull wanted me to say to you that any counsel fees involved beyond this amount will be absorbed by him. I trust the foregoing is satisfactory to you and in accordance with this plan you will find enclosed check in the amount of $25,750.00 made up as follows: 4 1/2% Note - reduced principal amount
$ 5,800.00
5% Note
5,000.00
1100 shares at $12.00
13,200.00
250 options at $7.00
1,750.00
TOTAL
$25,750.00
Incidentally, the amount received by you for the stock and options is $3,700 more than you would have received under the original offer of Paxton & Gallagher.↩
3. Sec. 174 provides in part as follows: SEC. 174. RESEARCH AND EXPERIMENTAL EXPENDITURES. (a) Treatment as Expenses. - (1) In general. - A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction. Sec. 1.174-2 of the Income Tax Regulations provides in part as follows (a) In general. (1) the term "research or experimental expenditures," as used in section 174, means expenditures incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense. * * * (2) The provisions of this section apply not only to costs paid or incurred by the taxpayer for research or experimentation undertaken directly by him but also to expenditures paid or incurred for research or experimentation carried on in his behalf by another person or organization (such as a research institute, foundation, engineering company, or similar contractor). * * *↩