EDWIN A. SNOW AND HELEN B. SNOW, PETITIONERS *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 7125–70.    Filed June 30, 1972.

*Harold W. Walker* and *Burgess L. Doan*, for the petitioners.
*Rudolf L. Jansen*, for the respondent.

BRUCE, *Judge:* Respondent determined a deficiency of $6,247 in the income tax of the petitioners for the calendar year 1966. Edwin A. Snow was a member of a partnership which reported a net loss for 1966 by reason of a deduction claimed under section 174, I.R.C. 1954, for expenditures for research and experimentation. Respondent disallowed the pro rata share of such loss claimed by the petitioners. The sole issue for decision is whether such expenses are properly deductible. Some facts are stipulated.

### FINDINGS OF FACT

The stipulation of facts and the exhibits attached thereto are incorporated by reference.

Edwin A. Snow and Helen B. Snow are husband and wife. They filed a joint Federal income tax return for the calendar year 1966 on the cash basis with the district director of internal revenue at Cincinnati, Ohio. They were residents of Cincinnati on the date of the filing of the petition herein.

Edwin A. Snow is a graduate of Stanford University and Harvard Graduate School of Business. He holds degrees of B.A. in economics and M.A. in business administration. He took no engineering courses and has never applied for a patent. He has been employed by Proctor & Gamble Co. since 1933. His work was in advertising and marketing and later in management. In 1966 he was executive vice president and a member of the board of directors of Proctor & Gamble.

David H. Trott was an employee of Proctor & Gamble Co. for 22½ years, resigning in 1963. His work was in advertising and marketing and general management. He has been acquainted with Snow since about 1942. He holds a degree of B.A. in liberal arts. He has no degree in engineering. He had no training or experience in engineering prior to 1963.

In 1964 Trott bought a 25-percent interest in Crossbow, Inc. The other stockholders were Robert Boggild and William Dale. This corporation did shopwork in machining and fabricating. It had some 25 customers for whom shopwork was done. It occupied a building at 8120 Blue Ash Road, Cincinnati, which had 5,000 square feet of floor space on the ground floor, a basement of 4,000 square feet, and various items of shop and manufacturing equipment. On the main floor 1,000 square feet were separated for office and designing work. Later Trott owned a 50-percent interest in Crossbow and in December 1965 became sole owner.

At the time Trott acquired an interest in Crossbow his associates were experimenting upon a telephone-answering device. Trott took part in developing the project further. Trott had conceived the idea of a tape-recording device and the engineers and employees of Crossbow worked on that project. Trott had also conceived the idea of a leaf burner or trash burner and Crossbow's employees worked at making models of that for experiment and development.

In March 1965 Snow and certain others agreed to invest funds in the research and development of the telephone-answering device and the tape-recording device upon which Trott and his associates were conducting experiments. A certificate of limited partnership under the laws of Ohio was signed by Trott, Boggild, and Dale, as general partners, and George L. Sterne, Edwin A. Snow, trustee, Edward J. Noble, L. S. Brucker, Jr., trustee, and Eugene W. Gilson, as limited partners, under the name "Echo Development Company" to develop the telephone-answering device. Sterne contributed all right, title, and interest to the product concept. Snow, Noble, Brucker, and Gilson each contributed $15,000. Trott and Sterne were each to have a 20-percent interest in the profits. The others were each to have a 10-percent interest. The principal place of business was to be at 8120 Blue Ash Road, Cincinnati.

A certificate of limited partnership under the laws of Ohio was also signed in March 1965 by Trott, Boggild, and Dale as general partners, and Snow, trustee, Noble, Brucker, trustee, and Gilson as limited partners to be conducted under the name of "Courier Enterprises." This was to develop the tape-recording device. The limited partners each contributed $5,000 in cash. Trott was to have a 40-percent interest in the profits, the other partners were each to have a 10-

percent interest. The principal place of business was to be at 8120 Blue Ash Road, Cincinnati.

In April 1965 Trott wrote Boggild, then president of Crossbow, as follows:

This outlines the basis on which Crossbow will undertake development work on a compact battery-operated tape recorder, designated by the code name CINCH, on behalf of the partnership owning all rights to same, known as Courier Enterprises.

1. Crossbow will develop CINCH to the working model stage, and as far beyond as available money may afford.

2. All work will be done on a time and materials basis, at the following labor rates:

|                            |              |
| -------------------------- | ------------ |
| Drafting                   | $6.00 per hour |
| Shop                       | $8.00 per hour |
| Design                     | $9.00 per hour |
| Development Engineer       | $12.00 per hour |
| Chief Project Engineer     | $20.00 per hour |

It is my understanding that the above rates are competitive in the community to those charged by other shops engaged in similar work.

3. Crossbow will exert its best efforts to complete the assignment within the funds which Courier Enterprises has available for this purpose—$20,000.00 in total.

4. Crossbow will make every effort to complete the assignment within nine months from this date. If in the sole opinion of Courier Enterprises the progress of the project is unsatisfactory, it may remove the project from Crossbow responsibility after one year from this date.

5. Any equipment purchased by Crossbow solely for use in connection with this assignment, will be charged to the project and will become the property of Courier Enterprises.

6. All rights to patentable features, and to patents thereon, developed by Crossbow specifically in the course of development work on CINCH, will become the property of Courier Enterprises.

7. Courier Enterprises will be billed monthly for time and materials. No advance payments will be made. On occasion, however, Crossbow may request a cash advance when necessary to cover a substantial cash outlay by Crossbow, in the amount of this outlay.

8. The confidential nature of Crossbow's work on CINCH will be guarded insofar as possible by written security agreements signed by all Crossbow employees.

Please initial one copy of this letter and return it to me, as evidence of your agreement.

Crossbow carried out research and experimental work for Echo on the telephone-answering device upon the same basis.

Trott reported to the other partners in Echo as of March 1, 1966, as follows:

ECHO DEVELOPMENT CO. MARCH 1, 1966 REPORT

This should be the last "progress report" on EAR prototype development. Minor modifications to the instrument are being made by the consulting

electronics engineer we retained to give the audio system a final check. These will complete all work on the device itself.

Patent counsel advises he will have the patent application completed this month.

Final costing and other paper work has been slowed by the absence due to illness of Mr. Boggild, but this, too, will be finished shortly.

Before March is out, therefore, we hope to present to the partnership the results of this development project and to secure agreement on the best manner in which to exploit it commercially.

[Signature omitted.]

In 1966 the telephone-answering device and the tape-recording device had been developed to the stage of being ready for sale. The partners hoped to license some manufacturers to build and market them. An application for a patent on the telephone-answering device was filed in August 1966 and a patent was issued in November 1969 to R. Boggild. An application for a patent on the tape-recording device was filed in November 1967 and a patent was issued in October 1969 to H. E. Hancock.

Crossbow also carried out research and development work on the leaf-burning device as directed by Trott, upon the same cost basis as work for Echo and Courier. Altogether some 26 or more models were made and tried out in 1964 and thereafter. It was not developed to the point of being ready for sale in 1966.

In December 1965 patent counsel for Trott wrote him concerning the possibilities of securing patent protection for the device, then referred to as a "leaf burner" or a "cyclone burner." Counsel noted several features which he thought were patentable. He wrote:

This is a report of the supplementary patentability search which we have made with respect to your cyclone burner invention. As I understand it, the original search made in late 1964 was reported orally. I believe at that time you were advised that there was no chance for patent protection on the broad concept of a cyclone furnace used in conjunction with a vacuum cleaner type leaf collector mounted on a rolling platform.

Your invention has progressed from the time of that report in the direction of improving the burning apparatus and you have improved it in three major respects. First, you mount a diverter at the top of a primary combustion chamber and create above it a secondary combustion chamber. The diverter has a central passageway projecting into the primary combustion chamber. Distribution vanes are secured to the top of the passageway and cause gases and entrained solids to be swirled in the secondary chamber.

The second feature might be called your ignition structure. This comprises a grate at the lower end of the primary combustion chamber in combination with vanes extending across the lower end of the combustion chamber and spaced above the grate. A secondary air inlet passageway is connected to the lower end of the combustion chamber below the grate. In operation, a few glowing briquettes are placed on the grate and the secondary air causes them to glow brightly and ignite any solids contacting them. The vanes serve to break up the high velocity swirling air in the main combustion chamber,

thereby creating in the space between the vanes and the grate a more or less gently flowing air which permits the solids to remain in contact with the briquettes for a sufficient length of time for their ignition.

The third feature comprises the use of a cooling jacket surrounding the main and secondary combustion chambers with provision for bleeding secondary air from the main intake blower to the jacket. The important aspect of this feature is that a large volume of air is required to bring the solids into the burner but preferably that volume of air should be diminished before going into the combustion chamber for too much air will have an adverse effect on the burning. By taking secondary air from the main intake, you are able to provide (a) sufficient air to bring the solids into the system, (b) sufficient air for cooling, and (c) diminished air, as desired, in the combustion chamber.

We are of the opinion that the Patent Office would be justified in granting protection to the features as outlined above. * * *

I am not sure that you are ready to have the patent application prepared. If you are in the process of constructing a prototype utilizing your inventive features, you may wish to delay the preparation of the application until the completion of the prototype so that the application as filed will have the benefit of any improvements and/or greater understanding of the operation obtained through the creation of the prototype.

In February 1966 Trott's patent counsel expressed the opinion that the leaf-burner invention had not been sufficiently reduced to practice to be patented. Counsel stated that examination of two models and discussion of tests made showed that neither performed satisfactorily enough to be a marketable product, that one burned too hot and the other did not handle fresh leaves well, and suggested that additional work would be necessary to modify the models for the continuous leaf-burning function.

In February or March of 1966 Snow orally agreed to join in a limited partnership venture to assist Trott in financing development of the trash- or leaf-burning device. He was aware that patent counsel had expressed an opinion that the device was unique. Snow thought it was or could be marketable and believed that no such equipment was then on the market. He had seen the models then developed.

On July 8, 1966, an agreement to form a limited partnership under the laws of Ohio was signed by Trott, as general partner, and Snow, Eugene W. Gilson, and Thomas J. Klinedinst as limited partners. Trott was also listed as a limited partner contributing—

All right, title and interest to a product concept, individually owned by David H. Trott, more particularly described as an incinerator designed for rapid consumption and burning of tree leaves and similar combustible materials.

Gilson contributed $20,000 for an 8-percent interest in the profits. Snow and Klinedinst each contributed $10,000 for a 4-percent interest. Trott had a 50-percent interest as general partner and 34-percent as limited partner.

The partnership was to be conducted under the name of "Burns Investment Company." Its principal office and place of business was to be at 8120 Blue Ash Road, Cincinnati. Its stated purpose was the development of "a special purpose incinerator for the consumer and industrial markets." The general partner was to have the sole right of management and conduct of the business. The partnership was to commence upon the execution and delivery of a certificate of limited partnership in accordance with section 1781.02 of the Ohio Revised Code. Item 9 provided:

9. The liability of each Limited Partner for partnership debts shall in no event exceed the amount of contribution stated in this agreement and the certificate as having been made by each of them.

On April 3, 1967, the partners in Burns Investment Co. signed an amendment to the agreement of July 8, 1966. The amendment contained the following new provision:

Notwithstanding the above percentage of interest for each partner, if the partnership experiences a net loss for any fiscal year or period which loss reduces the total credit balance in the capital accounts of the partnership to an amount which is lesser than the total amount of cash contributed by the Limited Partners to the partnership's capital, then such portion of the net loss which causes the reduction in the contributed cash capital shall be shared solely by the Limited Partners in the same proportion that the amount of their cash contribution bears to the total amount of cash contributed by all the Limited Partners. And while there exists any reduction in the Limited Partners' contributed cash capital and the partnership experiences a net profit in the following fiscal year or period, then such portion of the net profit which eliminated such reduction and restores the total cash contributed to capital shall be shared solely by the Limited Partners in the same proportions as is set out above for the sharing of any net loss.

Nothing in this Item 4 is intended to modify or change the express language of Item 9 of this agreement.

The modifications made herein to the General and Limited Partners' interest in the partnership's profits and losses shall be effective for the fiscal period ending December 31, 1966 and thereafter.

During 1966 Burns Investment Co. paid the following bills from Crossbow for development work on the leaf burner:

| Date of bill | Amount | | Description |
|---|---|---|---|
| 7/15/66 | $8,684.44 | Work 2/65–4/66 | Shop, designers, engineers, materials. |
| 7/31/66 | 4,215.89 | Work 5/66–7/66 | Shop, engineer, materials. |
| 12/9/66 | 8,863.73 | Work 8/66–11/66 | Shop, designers, engineers, consultant, materials. |
| 12/30/66 | 12,500.00 | Management, 500 hours | |
| 12/30/66 | 2,516.38 | Balance on services | |
| | 36,780.44 | | |

The management services were by Trott, the engineering services largely by Boggild. The work involved building models. The work was done by Crossbow employees, including Trott.

In 1966 Burns had no manufacturing plant of its own, and had no office or separate facility. At the Crossbow shop Burns had no telephone. There was no sign on the building concerning Burns.

When the funds amounting to $40,000 contributed to the Burns partnership by the limited partners were exhausted, Trott financed further development of the leaf burner from his own funds.

After 1966 the design of the leaf burner was changed in some particulars.

Trott filed an application for a patent on the leaf burner on June 10, 1968. A patent was issued on March 3, 1970, to Trott.

Prior to 1970 a corporation was organized under the name of Burns Investment Corp. to produce and market the leaf burner. Many of the parts of the device were made under contract and Burns assembled it. It was called the "Trash-Away," and was advertised as for burning trash as well as leaves.

The leaf-burning or trash-burning device, as eventually patented, was a burning chamber which could be mounted on a 20-gallon trash can, or built in a larger size for use with a 55-gallon drum. It was constructed with two openings at the top, one for the admission of forced air, the other for exhaust of the combusted gases. The top layer of the material to be burned would be ignited and forced air from a blower would hasten the burning process. The air was introduced tangentially in such a way as to utilize the principles underlying the cyclone furnace, to establish a circular pattern of air movement taking advantage of centrifugal force to restrain still solid materials from reaching the exhaust port. It was novel in burning the materials from the top down. A regulator was provided to control the volume of air used.

Burns Investment Co. filed a partnership return of income for Form 1065, for the taxable period August 1, 1966, to December 31, 1966. This reported the capital as of August 1 to be $40,000, and as of December 31, to be $3,219.56, showing a loss of $36,780.44, of which Snow's share was $9,195.11. The return reported no income and claimed expenses of $36,780.44 for research and development. It stated that the company "elects to expense in the current taxable year—its first taxable year—research and development expenses pursuant to Section 174(a)."

Burns Investment Co. filed a partnership return of income for the calendar year 1967 reporting no income and no expenses. The company filed a partnership return for 1968 reporting no income, expenses of $3,217.64 for research and development, and $1.92 for bank service, leaving no assets at the end of the year.

Echo Development Co. filed a partnership return of income, Form 1065, for the taxable period March 16 to December 31, 1965, reporting income of $823.27 from interest, expenses of $79,990.87, and loss of $79,167.60. The expenses included $76,592.65 as engineering services, research and development expense, and an election was made to expense these pursuant to section 174(a). The schedule of partners' shares of income showed that Snow paid in $15,000 of capital and made a further contribution of $6,325, and that his share of the loss was $7,916.76. Echo filed a partnership return for 1966 reporting no income, expenses of $5,628.94, including research and development expense of $5,311.51. As a result of other capital contributions, the partnership had assets of $482.68 at the end of the year 1966. Echo filed a partnership return for 1967 reporting no income and no expenses.

Courier Enterprises filed a partnership return of income, Form 1065, for the taxable period March 22 to December 31, 1965, reporting income of $377.02 from interest, expenses of $20,054.13, and loss of $19,677.11. The expenses included $19,636 as engineering services, research and development expense, and an election was made to expense these pursuant to section 174(a). The schedule of partners' shares of income showed that Snow paid in $5,000 of capital and his share of the loss was $1,967.71. The assets at the end of 1965 were reported as $322.89. Courier filed a partnership return for 1966 reporting no income, with expenses of $15.44. Courier filed a partnership return for 1967 showing no income and no expenses.

The petitioners reported in their income tax return for 1966 salary of Snow, dividends, interest, capital gains and losses (resulting in a net loss), income and expenses of joint venture oil operations resulting in a net loss, expenses of a thoroughbred racehorse operation from which no income was derived, and partnership income or losses (all shown as losses) in the following amounts:

| Partnership | Loss |
| --- | --- |
| Echo Development Co | $563 |
| Courier Enterprises | 2 |
| Burns Investment Co | 9,195 |
| Total | 9,760 |

In 1966 Snow devoted at least 50 hours per week to his duties as an officer of Proctor & Gamble. He devoted approximately 3 to 4 hours weekly, on the average, to his thoroughbred racehorse operation and 1 hour per week to his joint venture oil operation. He devoted some time to frequent meetings and conversations with Trott concerning the inventions of the telephone-answering device, the tape recorder, and the trash or leaf burner. He witnessed tests of the models of the leaf burner. He gave advice in 1965 and thereafter on the possible methods of promoting and marketing the three devices when they were de-

veloped to the stage of being salable. His meetings with Trott were sometimes at the Crossbow shop, sometimes at restaurants, and sometimes at his home or Trott's. He discussed the devices with Trott in telephone conversations. He did not seriously consider abandoning the burner device at any time.

Burns Investment Co. was not engaged in trade or business in 1966. The expenses for research and experimentation upon the trash-burning device paid by Burns Investment Co. in 1966 were not paid or incurred in connection with the trade or business of the partnership or of Snow.

OPINION

Edwin A. Snow invested $10,000 in 1966 in the limited partnership, Burns Investment Co., which was formed to develop and market a trash- or leaf-burning device invented by his friend Trott. The partnership, which was managed by Trott as the general partner, used the funds paid in by Snow and other limited partners to pay expenses of research and experimentation upon the invention. The partnership elected to deduct these expenses as permitted by section 174, I.R.C. 1954.[1] The partnership return of income reported no income, but a loss on account of expenses of $36,780.44 for research and experimentation for the taxable period ended December 31, 1966. The petitioners, in their return for 1966, claimed a deduction for Snow's share of this in the amount of $9,195. Respondent determined that the deduction was not allowable to Burns Investment Co. under section 174 or any other provision of the Internal Revenue Code and disallowed the deduction claimed by the petitioners.

Section 174(a)(1) permits a taxpayer to deduct research or experimental expenditures incurred or paid "in connection with his trade or business." The related regulations provide in section 1.174-2(a) (1) and (2):

The term "research or experimental expenditures" as used in section 174, means expenditures incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense. * * *

(2) The provisions of this section apply not only to costs paid or incurred by the taxpayer for research or experimentation undertaken directly by him but also to expenditures paid or incurred for research or experimentation carried on in his behalf by another person or organization (such as a research institute, foundation, engineering company, or similar contractor).

---

[1] SEC. 174. RESEARCH AND EXPERIMENTAL EXPENDITURES.

(a) TREATMENT AS EXPENSES.—
(1) IN GENERAL.—A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.

It is Snow's position that in 1966 he actively participated in the research and development as well as the overall management of three partnerships, Burns Investment Co., Courier Enterprises, and Echo Development Co., all of which were engaged in the trade or business of developing, perfecting, and obtaining patents on new products; that as a member of such partnerships, he held for sale or licensing rights to products which had been developed and were ready for manufacturing; and that, by virtue of his participation in such partnerships, he was then engaged in the business of developing, perfecting, and obtaining patents on new products for commercial exploitation.

Respondent concedes that the expenditures were for research and experimentation. The issue is whether they were paid or incurred by Snow "in connection with his trade or business," or the trade or business of Burns Investment Co.[2]

Whether an individual is engaged in a trade or business is essentially a question of fact to be determined from the evidence. *Higgins* v. *Commissioner*, 312 U.S. 212 (1941). It is well settled that an individual may be engaged in two or more businesses. *George A. Butler*, 36 T.C. 1097 (1961). An individual may be engaged in business by being a partner in a business. *Flood* v. *United States*, 133 F.2d 173 (C.A. 1, 1943). In *Deputy* v. *du Pont*, 308 U.S. 488, 499 (1940), Mr. Justice Frankfurter, in a concurring opinion joined in by Mr. Justice Reed, stated that "carrying on any trade or business, * * * involves holding one's self out to others as engaged in the selling of goods or services."

Petitioners cite *Cleveland* v. *Commissioner*, 297 F.2d 169 (C.A. 4, 1961), modifying 34 T.C. 517 (1960), and *Best Universal Lock Co.*, 45 T.C. 1 (1965).

In *Cleveland* v. *Commissioner, supra,* the taxpayer, and attorney, advanced funds to Hans Kerla, an inventor, for several years to finance research and development of an inorganic liquid binding material. In 1956 the parties signed an agreement to the effect that Kerla held the invention in trust, one-half for himself, one-half for Cleveland, that they would share equally in any proceeds, that Kerla would spend full time in active experimentation upon the invention and that Cleveland would advance expenses. The Court of Appeals concluded that Cleveland was thereafter engaged with Kerla in a joint venture in the trade or business of promoting the commercial development of the invention in which Cleveland owned a one-half interest, and the advances which he made thereafter were deductible under section 174.

---

[2] See and compare *Kenneth Reiner*, 24 T.C.M. 1005 (1965), for a discussion of sec. 174, its purposes and application.

Petitioners point out that Snow similarly advanced funds to a partner for research and experimentation for an interest in the profits expected to be derived.

We do not consider the Court of Appeals' decision in *Cleveland* as controlling in the present case. In the cited case the inventor had been engaged in research and experimentation upon the invention for more than 10 years, and had applied for patents. The taxpayer had made extensive loans to Kerla to finance the research, had carried on negotiations leading to the transfer or proposed transfer of rights to prospective users of the invention, and had prepared legal documents concerning such transfers. Following all this the parties agreed that Kerla held the invention in trust, one-half for himself and one-half for Cleveland. We interpreted the agreement as constituting, at most, a sale by Kerla to Cleveland of a one-half ownership in the invention in consideration of prior moneys advanced, and not as a partnership or joint venture. The agreement did not seek to characterize advances made thereafter. We concluded that all advances made by Cleveland, both before and after the agreement, were loans to Kerla expendable by him as he saw fit. The Court of Appeals agreed that the advances prior to the agreement were in the nature of loans, but interpreted the agreement as creating a joint venture and held that expenditures for research and development made thereafter were deductible. The present case is different. In 1966 Trott had hardly begun experimentation upon the trash burner, the application for a patent was not made until 1968, the advance of funds was made only in 1966 and no effort to market or sell the device was attempted until several years later. The partnership, Burns Investment Co., had as yet no trade or business in 1966 and the expenditures paid in that year were not "paid in connection with" its trade or business but were preparatory to a business which came into existence after the taxable year. *Morton Frank*, 20 T.C. 511 (1953) ; *George C. Westervelt*, 8 T.C. 1248 (1947) ; *Frank B. Polachek*, 22 T.C. 858 (1954) ; *Richmond Television Corporation* v. *United States*, 345 F.2d 901 (C.A. 4, 1965) ; *Mayrath* v. *Commissioner*, 357 F.2d 209 (C.A. 5, 1966), affirming 41 T.C. 582 (1964) ; *John F. Koons*, 35 T.C. 1092 (1961).

In *Best Universal Lock Co.*, *supra*, a corporation in the business of making locks undertook research and experimentation upon an isothermal air compressor. Respondent contended that expenses of such research were not deductible because they were unrelated to the corporation's lock business. In holding the project an integral part of the corporation's trade or business, we said, at page 10 :

We find nothing in the legislative history of section 174 to support respondent's contention that the section was not meant to cover research and development expenses where a corporation was seeking to develop a new product unrelated to its past line of products. An express purpose of the new section in the 1954

Internal Revenue Code was to encourage taxpayers to carry on research and experimentation, S. Rept. No. 1622, 83d Cong., 2d Sess., p. 33, and we think respondent's limited approach would prove inimical to such congressional purpose.

In *Best Universal Lock Co., supra*, the taxpayer corporation was already in a going business when it undertook research and experimentation upon the new and different item. In the present case the Burns partnership was experimenting upon its only invention and was not as yet engaged in a business as to that item.

Snow contends that because, in addition to Burns, he was also a participant in Trott's other partnerships, Courier and Echo, which in 1966 had inventions ready for sale or licensing, he, and Trott as well, were in the trade or business of inventing, developing, and marketing patentable products, and that although the Burns invention was not completed, it was a similar product, the research expenses of which should be deductible in accordance with the principle of *Best Universal Lock Co., supra*.

We note that there were no sales nor attempts to sell by Burns in 1966, 1967, or 1968. There were no goods held for sale by Burns in the taxable year 1966. And if the other partnerships, Courier and Echo, and the inventions they developed may be considered in this connection there were no sales by either of them in 1966 or 1967. While Snow said these inventions were ready for sale or licensing, there is no evidence that any effort was made to sell them. Snow testified that such a sale was Trott's function. Trott did not mention any attempt to offer them for sale.

In *Industrial Research Products, Inc.*, 40 T.C. 578 (1963), an individual taxpayer, Knowles, claimed a deduction for expenses of a business he allegedly carried on from his home as a consulting engineer. He was a corporate executive receiving salary income. He contended that deduction of such expenses was justified by reason of his carrying on a business as an inventor. While he testified that some patents had been issued to him it was not clear that he worked on these inventions in the taxable year. We said, "At any rate the mere working on inventions during the year in question with no activity of offering them for sale or license, would be insufficient to show engagement in an inventing business."

In *Stanton v. Commissioner*, 399 F.2d 326 (C.A. 5, 1968), affirming a Memorandum Opinion of this Court, the taxpayer sought to deduct research and experimental expenditures incurred in the development of a "storm proof" boat. The Court of Appeals concluded that the taxpayer's efforts as an inventor lacked that degree of continuity and regularity that is essential before an activity can be found to constitute a trade or business. The taxpayer's efforts, spread over a num-

ber of years, were irregular and sporadic, and his revenue was negligible.[3]

Although a taxpayer may be in the business of doing research and experimentation, or of being an inventor, it is necessary that this be related to the development or improvement of existing products or services, or to new products or services in connection with a going trade or business.

In *John F. Koons, supra*, the taxpayer purchased an invention and contracted with a laboratory to develop it. He claimed a deduction under section 174 for the amount paid to the laboratory. We held that these expenses were not made in connection with any existing trade or business of the taxpayer and that the undertaking involved was not in itself an existing business in the taxable year. We said at pages 1100–1101:

> It is our view that section 174(a)(1) applies to expenditures for research and experimentation in connection with an existing business to which such research and development is proximately related, such as the development or improvement of its existing products or services, or the development of new products and services in connection with such trade or business. We do not suggest that these generalities are all-inclusive. In the instant case, however, there was no such existing trade or business. The research and experimentation was no doubt in anticipation of the organizing of a business to make business use of an end product when it reached the point of commercial acceptability. At the time the invention was bought by petitioner, however, it was in a preliminary laboratory state, and petitioner entered into the so-called Development Contract in part, at least, to get the benefit of research specialists. He went no further than this in 1955, however. It is our view that this activity was preliminary to the coming into existence of a business, and did not reach the stage of an existing business in the year in question within the meaning of section 174(a)(1). The research and development expenditures could not be "in connection with" a business which did not exist.

In the *Koons* case we held that the taxpayer was not yet in business but was merely preparing to enter a business which would commercially exploit a patent, so that the costs of developing the patent were not currently deductible.

The partnership Burns Investment Co. in 1966 was not holding itself out to others as engaged in the selling of goods or services. Its research and experimentation was not related to the development or improvement of existing products or to new products in connection with an existing trade or business. Cf. *Best Universal Lock Co., supra*. It follows that Burns was not engaged in carrying on a trade or business in 1966 and that the expenditures for research and experimentation here involved were not paid "in connection with" the trade or business of the partnership or of Snow.

*Decision will be entered for the respondent.*

---

[3] Cf. *Myron E. Cherry*, 26 T.C.M. 557 (1967); *Charles H. Schafer*, 23 T.C.M. 927 (1964); *William S. Scull II*, 23 T.C.M. 1353 (1964).